CROWN CENTRAL PETROLEUM COR-
PORATION and United Refining
Company, Plaintiffs-Appellants,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb,
Defendants-Appellees.

No. DC-40.

Temporary Emergency Court of Appeals.

Argued July 8, 1976.

Decided Sept. 3, 1976.

Rehearing Denied Oct. 26, 1976.

Neal M. Mayer, Coles & Goertner, Washington, D.C., with whom Paul D. Coleman and Charles L. Haslup, III, Washington D.C., were on the brief for plaintiffs-appellants.

Marvin L. Coan, Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D.C., were on the brief for defendants-appellees.

Before CARTER, CHRISTENSEN, and JOHNSON, Judges.

CHRISTENSEN, Judge.

This is a case for statutory construction, the ultimate decision of which centers upon the meaning to be accorded the expression "receipt . . . of payments" in the context of Section 403(a) of the Energy Policy and Conservation Act of 1975 (EPCA).[1] From summary judgment denying injunctive and declaratory relief because the district court determined that the words did not have the meaning and effect appellant refining companies attributed to them,[2] this appeal has been prosecuted.

---

1. 15 U.S.C. § 753(e) (Supp. V, 1975). See generally 89 Stat. 871 et seq. (1975); 42 U.S.C.A. § 6201 et seq. (Supp. Mar. 1976).

2. The Memorandum and Order of the district court entered judgment for the defendants on three grounds: (1) The statute did not mean what appellants claim, and if Congress had intended such a meaning, it could have spelled the meaning out far more clearly, (2) the legislative history is confusing, but on balance supports the position of the defendants and (3) the interpretation of the agency is a factor to weigh in the balance against plaintiffs' contention.

The Entitlement Program[3] was established in December 1974 to ameliorate the disparity which existed under the two-tier pricing structure for crude oil between those refiners who had access to old oil supplies and thereby had substantially lower crude costs and those who had to rely on new oil for refinery runs, thus incurring higher crude costs. Under this program the FEA computed monthly the adjusted national old oil supply ratio (the ANOOSR or ratio) of old oil to total oil used in refinery runs. Refiners whose ratio was higher than the national ratio were required to purchase entitlements from the refiners whose average was lower than the national ratio. Since the FEA set the prices for entitlements at a level approximating the difference between the prices of old and new oil, the crude costs for all refiners were approximately equalized.[4]

The national ratio of old oil runs to total refinery runs was lowered somewhat by the issuance of additional entitlements to small refiners under the "small refiner bias" built into the regulations.[5] To further reduce the potential economic impact which purchase obligations could have had on small refiners who were required to purchase entitlements, the FEA adopted Special Rule 3, which had the effect of temporarily exempting certain small refiners from part of their purchase obligations.[6] Small refiners, furthermore, were allowed to apply for exception relief under 10 C.F.R. § 205.50 for "serious hardship or gross inequity".[7] Under FEA regulations, the number of additional entitlements granted to small refiners by reason of the small refiner bias was subtracted from the total old oil receipts prior to the calculation of the ANOOSR.[8] This practice was carried over to exemption relief pursuant to Special Rule 3.[9]

Thus prior to passage of EPCA these exemptions and exceptions, as well as the specially issued small refiner entitlements, were subtracted prior to computation of the ANOOSR. The result was that the ratio was lower than it would have been had the exemptions not been subtracted and, therefore, the number of entitlements issued to entitlement sellers was decreased proportionately. To use the comparison made by the trial court,[10] the ratio was like a pie; everyone who was in the program received a piece of the pie. But since the size of the pie was in part dependent upon the number of exemptions, exceptions and entitlements issued by reason of the small refiner bias, and since the size of each piece received was directly related to the size of the total pie, the size of each piece was affected by the number of exemptions, exceptions and small refiner entitlements issued.

It was against the background of such a regulatory system that Section 403(a) of EPCA, 15 U.S.C. § 753(e) (Supp. V, 1975), set out the following new provision which is in question here:

> Any provision of the regulation under subsection (a) of this section—
>
> (1) which requires the purchase of entitlements, or the payment of money through any other similar cash transfer arrangement, the purpose of which is to reduce disparities in the crude oil

---

**3.** 10 C.F.R. § 211.67 (1976), 2 CCH Energy Management ¶ 13,650.

**4.** See *Pasco, Inc. v. FEA*, Em.App., 525 F.2d 1391, 1395 (1975).

**5.** 10 C.F.R. § 211.67(e) (1976), 2 CCH Energy Management ¶ 13,650.25. See *Pasco, Inc. v. FEA*, 525 F.2d at 1395–97, *supra*. Small refiners are defined in the statute as "a refiner whose total refinery capacity . . . does not exceed 175,000 barrels per day." 15 U.S.C. § 752(4) (Supp. V, 1975). A similar definition appears in the regulation at 10 C.F.R. § 211.-67(e), 2 CCH Energy Management ¶ 13,650.25.

**6.** 10 C.F.R. § 211.71 appendix (1976), 2 CCH Energy Management ¶ 13,655A.

**7.** See *Pasco, Inc. v. FEA*, 525 F.2d at 1397, *supra*. Cf. *Powerine Oil Co. v. FEA*, Em.App., 536 F.2d 378 (1976), 3 CCH Energy Management ¶ 26,048.

**8.** 10 C.F.R. § 211.62 (1976), 2 CCH Energy Management ¶ 13,645.

**9.** See 10 C.F.R. § 211.71 appendix, *supra*, Special Rule 3 § 4.

**10.** T. 33–36.

acquisition costs of domestic refiners, and (2) which is based upon the number of barrels of crude oil input, or receipts, or both, of any refiner,

shall not apply to the first 50,000 barrels per day of input, or receipts, or both, of any refiner whose total refining capacity (including the refining capacity of any person who controls, is controlled by, or is under common control with such refiner) did not exceed on January 1, 1975, and does not thereafter exceed 100,000 barrels per day. The preceding sentence shall not affect any provisions of the regulation under subsection (a) of this section with respect to the receipt by any small refiner as defined in section 3(4) of payments for entitlements or any other similar cash transfer arrangement.

Appellants claim that this required the FEA to protect the interest of small refiner sellers by precluding the subtraction of entitlements by reason of the § 403(a) exemption to small refiner purchasers when computing the ANOOSR, thereby insuring that small refiner sellers received the same amount of payments they would have received absent the exemption. However, the FEA promulgated Special Rule 6 [11] which continued the prior practice of subtracting exemptions before making the ANOOSR computation.[12] It is this construction of which appellants complain.

We first look to appellants' claim that from the face of the statute it is obvious that the legislative purpose was to insure that small refiner sellers did not receive less benefit than they otherwise would have received had the exemption not been in effect. They contend that the words "receipt . . . of payments" in the last sentence

quoted above have subsumed within them the idea of amount, thereby requiring an interpretation that the amount of money received by small refiner sellers should not be diminished because of the buyer exemption; that to read the second sentence otherwise would ascribe to it no meaning at all since obviously the first sentence in and of itself does not purport to preclude the sale of entitlements or the right to receive payment for entitlements sold; and that Congress must have intended something more than a superfluous indication that the right of small refiners to sell entitlements should not be affected by the purchase exemption.

The appellees view the primary thrust of § 403(a) as concerning the statutory exemption for small refiner purchasers of entitlements and argue that in this context the last sentence was merely intended to make clear that the status of small refiners as sellers of entitlements was preserved even though certain small refiner purchasers of entitlements were statutorily exempt from the Entitlement Program.

■ Although not a model of clarity, we believe that the language of the statute is more susceptible of the latter construction. It does say rather plainly what the government claims and is ambiguous largely upon the theory that it was intended by Congress to say more. "[W]hen we depart from the words, ambiguity comes." See *Rhode Island v. Palmer,* 253 U.S. 350, 398, 40 S.Ct. 486, 64 L.Ed. 946 (1920) (McKenna, dissenting)—at least greater ambiguity would arise here it seems. We agree with the trial court that the second sentence "[r]ead in syntax, it refers only to the effect of the statutory amendment on 'provisions of the

---

**11.** Special Rule 6 in part provides:

"1. *Scope.* This Special Rule provides for a reduction in the entitlement purchase requirement under § 211.67(b) for certain refiners for October 1975 and subsequent months. . . .

"3. *Reduction in entitlement purchase requirements for certain refiners.* (a) Each refiner with a volume of crude oil runs to stills of 50,000 barrels per day or less in the month concerned, that would otherwise be required to purchase entitlements under § 211.67(b), shall not be required to purchase any entitlements

for the month of October 1975. . . ." 41 Fed.Reg. 1044 (Jan. 6, 1976), 2 CCH Energy Management ¶ 13,655D.

**12.** The rule stated:

"(c) The exemption from the purchase obligations of § 211.67(b) provided for by this section shall be given effect in the calculations under § 211.67 by proportionately increasing entitlement purchase and reducing entitlement sale obligations." 41 Fed.Reg. 1044 (Jan. 6, 1976), 2 CCH Energy Management ¶ 13,655D.

regulations,' not to the effect on the amount of money received by small refiner entitlement sellers . . . ." and that "[i]t speaks only of 'receipts' of payments of some kind as opposed to 'receipts' of the same payments as would have been made absent the purchase exemption for small refiners."

We do not find it incredulous, as contended by appellants, that Congress should seek to reassure small refiner sellers that they were not to be taken out of the Entitlement Program whether their refining capacity did or did not exceed 100,000 b/d, merely because buyers of less than that capacity were exempted from making some purchases of entitlements. Nor, assuming appellees' position to be correct, do we consider it "curious" as appellants argue, that the last sentence refers to small refiners as defined in Section 3(4) of the EPAA, i. e., 175,000 b/d or less, while the first sentence deals with small refiners of 100,000 b/d or less.[13] It seems to us that only if appellants' position were to be adopted might the disparity be thought curious. The more general reference to small refiners as sellers of entitlements seems appropriate under appellees' construction, since the right of no small refiner, however defined, to sell entitlements was to be affected.

■ In *Train v. Colorado Public Interest Research Group, Inc.* 426 U.S. 1, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976), the Supreme Court quoted the statement from *United States v. American Trucking Assoc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345, that "[w]hen aid to construction of the meaning of words, as used in a statute, is available, there certainly can be no 'rule of law' which forbids its [legislative history's] use, however clear the words may appear on 'superficial examination.'" (Footnotes omitted.) We have considered the legislative history of § 403(a), as did the trial court.[14]

Appellants argue that the legislative history of the provision manifests a congressional intent to protect the interests of small refiner sellers by precluding the subtraction of entitlements issued by reason of the exemption when computing the ANOOSR, thereby insuring that small refiner sellers received the same entitlement benefits they would have received absent the exemption. The legislative history to which they refer arguably supports this contention.[15]

---

**13.** "If the purpose of the second sentence", say appellants, "is to eliminate a misconstruction of the first sentence as to small refiner sellers of entitlements, one would expect the language of the second sentence to be limited to small refiners of 100,000 b/d or less." (Reply Br. 2.)

**14.** This notwithstanding that there seems less direct conflict in the terms of the statute than in that history and some thus might be led to suppose that we have only reluctantly sought statutory recourse. "Spurious use of legislative history must not swallow the legislation so as to give point to the quip that only when legislative history is doubtful do you go to the statute." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Columbia Law Review, 527, 543 (1947); 3 Sutherland Statutory Construction (Sands-4Ed.) 409, 428.

**15.** Senator J. Bennett Johnston, committee chairman in charge of the original Senate version of the bill, stated in floor debate that the "bill provides that this exemption is not to *restrict* the right of small refiner sellers of entitlements to receive their full payments. . . . ." According to the Senator, it was the intent of the bill to grant relief to purchasers but "not to reduce the amounts that small refiner sellers would otherwise receive under the program."

Senator Hartke in floor debate stated that the bill would insure that small refiner sellers "should continue to receive their full measure of entitlement payments". Representative Krueger stated that the "exemption expressly protects small refiner entitlement sellers against any loss of entitlement revenue and assures that these refiners will continue to receive the full benefit of their status as sellers under the entitlements program." The only other legislative history cited by appellants is a post-enactment letter written by Senator Hartke. The court below gave this no weight because of its untimeliness. But cf. *SEC v. New England Electric,* 384 U.S. 176, 86 S.Ct. 1397, 16 L.Ed.2d 456 (1966) where the Supreme Court looked, among other things, to post-enactment statements by the sponsor of a bill although there was a contradictory committee report.

Some of these statements could be thought to present ambiguities similar to that of the statutory provision in question, but one of Senator Johnston's statements is in clear conflict

■ To counter these statements, the government relies upon a report of the House Committee on Interstate and Foreign Commerce which formulated the section in question as it was eventually approved by the Senate-House Conference Committee and enacted into law. The latter report stated that under that section the ANOOSR was to be calculated just as it had been prior to passage of the Act, that is, by disregarding the old oil to which the exempted purchases would apply.[16] This is the only express reference in the legislative history to the method for implementing § 403(a). We are not impressed with appellants' argument that such implementation was to pertain only to the extent buyers of entitlements as opposed to sellers might be affected. The report was unequivocal and unconditional and, if applied, unavoidably would affect the total amount of payments received by the small refiner sellers contrary to the position of appellants.

■ Where, as here, there are conflicting statements between the floor debates and a committee report, many cases teach that the committee report should prevail.[17] But we gather the trend is less rigid—to heed the indications appearing most probative of congressional intent under all of the circumstances of the particular case.[18] Here we believe that the House Report is most convincing of that intent aside from the terms of the statute themselves, and the administrative interpretation to the same effect is not without weight.[19]

A post-judgment development discussed during oral argument warrants comment as it does raise a possibility of some misapprehension concerning the government's position and directs attention to an additional provision of EPCA in harmony with that position. Section 455(g) of the EPCA contains this provision:

> Notwithstanding the provisions of subsection (3) of section 4, the President

with FEA's position. The government argues that this statement should be accorded little weight since it was made in relation to S. 861, incorporated into S. 622, which in turn was ultimately abandoned by the conference committee in favor of H.R. 7014. From a review of the wording of the three bills it is apparent that although they were substantially similar, S. 861 to which Senator Johnston's statement was directed is hardly susceptible of the meaning appellants advance since it states only that the small refiner purchase exemption shall not effect the right of small refiners to "receive payments for entitlements." Decreasing the number of entitlements issued would not necessarily restrict the right to receive payments for those that were issued.

16. The House Report on this point reads:
"The Committee wishes to make clear its intent that any entitlements exempted by this section shall be treated just as the FEA now treats entitlement purchasers which it has excepted through administrative procedures, i. e., by disregarding the old oil to which such entitlement purchases would apply when calculating the National Adjusted Old Oil Supply Ratio." H.R. Rep. No. 94–340, 94th Cong., 1st Sess. at 48 (1975), U.S.Code Cong. & Admin. News, 94th Cong., 1st Sess., pp. 1762, 1810 (1975).

17. See e. g., Zuber v. Allen, 396 U.S. 168, 186–88, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); United States v. O'Brien, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); United States v. Auto Workers, 352 U.S. 567, 585, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); Inter. Tele. & Tele. v. General Tele. & Elec., 518 F.2d 913, 921 (9th Cir. 1975); Northern States Power Co. v. Minnesota, 447 F.2d 1143, 1152 (8th Cir. 1971); Banco Nacional de Cuba v. Farr, 383 F.2d 166, 172–77 (2d Cir. 1967); American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939, 949 (1966); and Atlantic City Electric Co. v. General Electric Co., 312 F.2d 236, 244 (2d Cir. 1962).

18. See FEA v. Algonquin SNG, Inc., 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976), where the Supreme Court gave substantial weight to statements of sponsors before committees and in congressional debates in line with its concept of the intrinsic meaning of the statute. See also Inter. Tele. & Tele. v. General Tele. & Elec., 518 F.2d at 921, supra; Brennan v. Corning Glass Works, 480 F.2d 1254 (3d Cir. 1973); Pan American World Airways, Inc. v. CAB, 380 F.2d 770, 782 (2d Cir. 1967).

19. This court has consistently held that in matters peculiarly within the expertise of the agencies great deference must be given their interpretation of statutory language. See e. g., Pasco, Inc. v. FEA, 525 F.2d at 1400, supra; Condor Operating Co. v. Sawhill, 514 F.2d 351 (TECA), cert denied, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); Reeves v. Simon, 507 F.2d 455 (TECA 1974), cert. denied, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975); American Nursing Home Ass'n v. Cost of Living Council, 497 F.2d 909 (TECA 1974).

may, if he determines that the exemption from payments for certain small refiners required by such subsection—

(1) results in unfair economic or competitive advantage with respect to other small refiners; or

(2) otherwise has the effect of seriously impairing the President's ability to provide in the regulation under 4(a) for the attainment of the objective specified in section 4(b)(1)(D) and for the attainment of those other objectives specified in section 4(b)(1);

submit, in accordance with the procedures specified in section 551 of the Energy Policy and Conservation Act, an amendment to modify the regulation under section 4(a) with respect to the provisions of such regulation as they relate to such exemption. Such amendment shall not take effect if disapproved by either House of Congress under the procedures specified in section 551.[20]

█ Pursuant to the foregoing, on May 18, 1976, FEA pursuant to the power delegated to it by the President issued a new regulation which revoked Special Rule 6 and made certain adjustments in the small refiner bias. The new regulation, of which we take judicial notice, had the effect of affording sellers prospective relief similar to that sought through this appeal.[21]

We express no view concerning the validity of the new regulations. That question is not before us and was neither briefed nor argued. It is appropriate to note, however, that they are consistent with FEA's position all along, being issued not in recognition of appellants' interpretation of § 403(a) but rather expressly upon the basis of subsequent experience and findings held to justify the change pursuant to authority granted in § 455(g). Indeed, the reference in the latter section to the determination (as one of the alternate prerequisites to a change) "that the exemption from payment for certain small refiners required by [the] subsection . . . results in unfair competitive advantage with respect to other small refiners . . ." supplies a *pari materia* gloss to § 403(a) in additional support of FEA's position.

The judgment below is affirmed.

---

**20.** This provision is codified at 15 U.S.C. § 760a(g) (Supp. V, 1975).

**21.** The new regulation, 41 Fed.Reg. 20392 (18 May, 1976), was accompanied by a statement explaining the intended purpose of the regulation. It was noted that the entitlement purchase exemption for small refiner purchasers was found to have operated inequitably toward small refiner sellers. Neither House of Congress disapproved the amendment. This case continues to be significant because of rights claimed to have accrued before the change.