ATLANTIC RICHFIELD COMPANY,
Plaintiff-Appellant,

v.

FEDERAL ENERGY ADMINISTRATION
et al., Defendants-Appellees,

Robert William Spinetti et al.,
Intervenors-Appellees.

No. 9–36.

Temporary Emergency Court of Appeals.

Argued Feb. 16, 1977.

Decided May 17, 1977.

F. Bruce Dodge, Morrison & Foerster, San Francisco, Cal., with whom Kenneth R. Clegg, San Francisco, Cal., was on the brief for appellant.

Linda L. Pence, Dept. of Justice Washington, D.C., with whom Irving Jaffe, Acting Asst. Atty. Gen., and Stanley D. Rose, Washington, D.C., were on the brief for appellees.

Tracy R. Kirkman, Cooper & Scarpulla, San Francisco, Cal., with whom Francis O. Scarpulla and Josef D. Cooper, San Francisco, Cal., were on the brief for intervenors-appellees.

Before CARTER, CHRISTENSEN, and ESTES, Judges.

CHRISTENSEN, Judge.

This case and a related case, *Robert W. Spinetti, et al. v. Atlantic Richfield Compa-*

*ny, et al.*, 552 F.2d 927 (Em.App.1976), initially were consolidated for the purposes of pending appeals and jointly decided by this court without oral argument. All parties asked rehearing or clarification of our opinion with respect to the case now before us, No. 9–36. No reconsideration was sought so far as the opinion treated No. 9–35.

A rehearing was granted as to No. 9–36, additional briefs have been filed, and oral arguments have been heard. Being convinced that the consolidated opinion insofar as it disposed of No. 9–36 was erroneous, we have severed the two appeals, amended and supplemented our prior opinion in the consolidated cases to recognize that severance, and eliminated from that opinion any reference to the present case except for brief review of proceedings common to both.[1] We now proceed to decide No. 9–36 upon rehearing.

In the court below Atlantic Richfield Company (ARCO) sought judicial review of two Federal Energy Administration (FEA) "Interpretations" and "Decisions and Orders"[2] pursuant to § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, (ESA) as incorporated in the Emergency Petroleum Allocation Act of 1973 (EPAA) (15 U.S.C. §§ 751, 754). The district court was asked to declare those interpretations and orders invalid and to enjoin preliminarily and finally the FEA from attempting to utilize them as a basis for

collateral estoppel against ARCO. The first order determined that firms such as Stanton W. Boyett distributing "Arco-refined petroleum products under the terms of Arco's Commission Distributor Agreement clearly fall within the definition of 'wholesale purchaser-reseller' " as defined in the Mandatory Petroleum Allocation Regulations, 10 C.F.R. § 211.51. [Record p. (R.) 326]. The second order determined that Gordon H. Wallace, an ARCO commission tank truck distributor, qualified as a wholesale purchaser-reseller under the same regulation.[3]

ARCO's complaint in the district court was answered by FEA, and certain Atlantic Richfield commission distributors and commission tank truck distributors intervened. ARCO filed a motion for a preliminary injunction. The FEA filed a cross-motion to dismiss or, in the alternative, for summary judgment. The district court denied injunctive relief to ARCO, granted the FEA's motion for summary judgment, and dismissed ARCO's action.[4] Judgment was entered accordingly on July 19, 1976, and ARCO has appealed to this court.

While the Boyett and Wallace problems were treated by the agency in separate proceedings, the sole issue addressed by the district court as to both was whether the distributors involved were wholesale purchaser-resellers within the contemplation of

---

1. See *Spinetti v. Atlantic Richfield Company and FEA*, 552 F.2d 927 (Em.App.1976).

2. Under "Decision and order," the appeal subsection of the FEA regulations section concerning "Administrative Procedures and Sanctions" provides:
   (a) Upon consideration of the appeal and other relevant information received or obtained during the proceeding, the FEA shall enter an appropriate order, which may include the modification of the order or interpretation that is the subject of the appeal.
   (b) The order shall include a written statement setting forth the relevant facts and the legal basis of the order. The order shall state that it is a final order of the FEA of which the appellant may seek judicial review.
   10 C.F.R. § 205.107. The general provisions of the same procedural section define an "Interpretation" as "a written statement issued by the FEA General Counsel or a Regional Coun-

sel, in response to a written request, that applies the regulations, rulings and other precedents previously issued by the FEA to the particular facts of a prospective or contemplated act or transaction." 10 C.F.R. § 205.2. Each titled "Decision and Order" denied ARCO's appeal of an "Interpretation".

3. The consequences of such a status are significant with respect to continuation of relationships and supplies, etc., but need not be elaborated here. See, e. g., *Basin, Inc. v. FEA*, 552 F.2d 931 (Em.App. No. 5–21, 1977), 3 CCH Energy Management ¶ 26,071; *Condor Operating Co. v. Sawhill*, 514 F.2d 351 (Em.App.1975), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

4. *Atlantic Richfield Company v. FEA*, 429 F.Supp. 1052, 3 CCH Energy Management ¶ 26,054 (N.D.Cal.1976).

10 C.F.R. § 211.51 and Energy Ruling 1975–8, 3 CCH Energy Management ¶ 16,048, in the light of which the FEA had indicated it would determine whether a firm is a wholesale purchaser-reseller.[5]

On this appeal ARCO presents the following issues:

1. Whether the FEA's failure to provide ARCO a hearing to determine adjudicatory facts requires that the Boyett and Wallace orders be vacated.

2. Whether the FEA's failure to disclose the facts upon which it relied when granting the Boyett and Wallace orders violated ARCO's due process rights.

3. Whether because ARCO did not have the opportunity to confront and cross-examine persons submitting statements to the FEA their hearsay statements could constitute substantial evidence to support the finding of the agency in the Boyett and Wallace orders.

4. Whether the FEA lacks authority to "regulate . . . [ARCO's] contractual relationship with its commission distributors and commission tank truck distributors."

The counterpoints formulated by FEA are essentially the same, with varied emphases.[6] Implicit in ARCO's pleadings below and its briefs here is additional concern for the agency's reliance upon the Boyett and Wallace Interpretations and Orders to collaterally estop ARCO from contesting from the status of its other distributors. This point is extended by the intervenors who state in their brief that "[t]he only issue for this Court to decide is whether the FEA's determination that ARCO's distributors are wholesale purchaser-resellers within the meaning of 10 C.F.R. § 211.51 is binding on ARCO in a subsequent civil action."

Before stating our conclusions concerning the foregoing points and discussing in greater detail the *res judicata* or collateral estoppel effect of "Interpretations" [7] which involves a problem of first impression in this court, it may be helpful briefly to put the orders here involved in broad context.

To carry out the congressional mandate of developing an allocation program,[8] FEA established fixed supplier/purchaser relationships as a frame of reference for allocating products. This supplier/purchaser concept was incorporated into the allocation regulations in an attempt to insure a continued flow of supplies by providing the maximum number of purchasers with currently identifiable suppliers. Regulations were promulgated which defined a variety of supplier/purchaser relationships. The "wholesale purchaser-reseller" category with which this case is concerned is described in 10 C.F.R. § 211.51, *supra*, as "any firm which purchases, receives through transfer,

5. ARCO in its briefs here has indicated, and in oral argument its counsel expressly stated, that this regulation and ruling were not being challenged.

6. 1. Whether the district court properly held that the Boyett Appeal Decision and Order of August 8, 1975, and the Wallace Appeal Decision and Order of February 13, 1976, were within the authority of the agency and supported by substantial evidence.

2. Whether the district court properly held ARCO's Fifth Amendment due process rights were not violated by FEA's denial of a full evidentiary hearing.

3. Whether FEA provided ARCO with relevant information to appeal the respective interpretations.

4. Whether the district court properly held that the agency decisions did not violate the impairment of contracts provisions in Article I, Section 10 of the United States Constitution.

7. See 10 C.F.R. subpart F, "Interpretations" §§ 205.80–205.86.

8. The Emergency Petroleum Allocation Act of 1973, later amended and extended by the Energy Policy and Conservation Act of 1975, was enacted by Congress in response to its finding that shortages of crude oil, residual fuel oil, and refined petroleum products existed or were imminent. The Act required the President to promulgate regulations providing for mandatory allocations in amounts and at prices specified in such regulations to achieve to the maximum extent practicable nine broad objectives, including preservation of an economically sound and competitive industry, the equitable distribution of refined petroleum products, and the minimization of economic distortions and unnecessary interference with market mechanisms.

or otherwise obtains (as by consignment) an allocated product and resells or otherwise transfers it to other purchasers without substantially changing its form."

The FEA issued Ruling 1975–8, 40 Fed. Reg. 30037, 3 CCH Energy Management ¶ 16,048 (July 17, 1975), regarding the applicability of the above-cited supplier/purchaser regulation to firms engaged in the business of marketing allocated products under written consignment agreements and setting forth general guidelines for determining which consignees were wholesale purchaser-resellers.[9] Noting that the terms of written consignment agreements and the actual practices between the consignees and their suppliers varied greatly, the Ruling invited firms which were in doubt about their status to request an interpretation from FEA with specific reference to their own particular factual situations.

On March 17, 1975, Stanton W. Boyett, of Agent's Alliance, Inc., requested an interpretation of the Mandatory Allocation Regulations with reference to the supplier/purchaser status of distributors operating under ARCO's "Commission Distributor's Agreement". The General Counsel of FEA issued such interpretation determining that firms which sell and distribute ARCO products under that form of agreement were wholesale purchaser-resellers as defined in § 211.51. ARCO appealed this interpretation to the FEA Office of Exceptions and Appeals, the procedure for the "exhaustion of administrative remedies" provided by regulation. 10 C.F.R. § 205.86. That office denied the appeal in a Decision and Order issued August 8, 1975. Atlantic Richfield Company, 2 FEA ¶ 80,647 (1975).

On October 16, 1975, Gordon H. Wallace submitted a request for a similar interpretation of his status under a "Commission Tank Truck Distributor's Agreement" with ARCO. An interpretation furnished by the Regional Counsel on November 11, 1975, determined that Wallace was a wholesale purchaser-reseller. ARCO filed an appeal with the FEA Office of Exceptions and Appeals, which was denied on February 13, 1976. Atlantic Richfield Company, 3 FEA ¶ 80,573 (1976). Resort to the district court and thence to this court followed as above noted.

■ Appellant's primary complaint during the administrative proceedings and on this appeal seems to be that the FEA did not accord it an evidentiary hearing before ruling upon its appeal from the interpretations. Indeed, as later will be seen, its mistaken insistence upon such a hearing as a claimed matter of right led it into a failure to respond to the invitation of the agency for informal submission of whatever additional facts it may have wished to rely upon. ARCO was afforded ample opportunity to participate in the administrative appeal process. It, as well as Boyett and Wallace, were allowed to forward written statements and documentation in support of the respective positions. ARCO did so, but submitted little evidence in support of its position. There was no constitutional or prejudicial error, nor was it an abuse of discretion, for the agency to decline to grant an evidentiary hearing under the circumstances, particularly in view of the innate nature of "Interpretations" as pointed out hereafter.[10]

---

**9.** Included in the Ruling is the following statement:

"A consignee which operates in the same manner as an independent jobber, and thereby qualifies as a wholesale purchaser-reseller, will generally have most (but not necessarily all) of the following characteristics: (a) Appropriate facilities and equipment for the conduct of the business of selling and distributing its supplier's products, (b) Responsibility, independent of its supplier, for its internal financial management and physical and administrative operation, (c) Responsibility to its supplier and others for expenses and liability arising from and connected with the business of transfer and sale of its supplier's product, and (d) Independent control over the disposition of the allocated product, including the right to enter into and terminate relationships with customers, rather than solely being restricted to distributing product to customers designated by the supplier." 3 CCH Energy Management ¶ 16,048 at p. 16,106.

**10.** See § 207 of the ESA, as incorporated into the EPAA by the latter's § 754, which differentiates interpretations from orders and other actions, requires regulations establishing "appro-

■ Appellant next contends that "FEA's failure to disclose the facts on which it relied when rendering the Boyett and Wallace orders violated its due process rights." It may be assumed that this contention relates to its attempt to "discover" everything which was before the General or Regional Counsel when the interpretations in question were issued. If this contention is considered literally, it borders on the frivolous from the very nature of uncontested interpretations in the first instance, and from the fact that the interpretations themselves stated their bases: the respective written agreements between the parties of which ARCO of course was well aware.[11]

■ But if appellant's point is that it was denied information in the administrative appellate process necessary to respond to the contentions of the opposing parties or to prosecute its administrative appeal, the record, again, fails to support appellant's position. It has seized upon a statement in the Boyett appeal decision that "an investigation on this Appeal has revealed that these distributors solicit new customers and additional sales of ARCO products", alleging that this "investigation" was never disclosed by FEA. Altogether too much is made of this reference.

After both ARCO and Boyett submitted statements to the agency, they were requested to provide additional information concerning the distributor's solicitation of customers. ARCO responded by a letter dated July 9, 1975, citing the formal contract in support of its contentions that distributors could not solicit new customers. Boyett also responded with material concerning practical operations under the contract to demonstrate that distributors exercised independent functions in soliciting sales. These submissions obviously constituted the investigation to which the order referred, and there is nothing to warrant the sinister imputation that the appeal office otherwise had been pursuing an independent survey which it had failed to reveal.

The most questionable element of the submissions was a statement on behalf of Mr. Boyett: "In checking with ARCO members of Agent's Alliance, almost each one contacted stated that up to 85% of their respective business was solicited solely by the Wholesale Commission Distributor." (R. 331). The government contends that if any survey supported that statement it played no part in the Boyett appeal decision. This argument does not address the question, nor can we tell from the record, whether the statement itself did or not; but if it did to any significant extent, the appellant is hardly in a position to complain. At no time prior to the final administrative ruling did it question this assertion nor did it submit information or comments to the contrary. In point of fact, no issue in respect to the Boyett situation was raised by ARCO except for an interpretation of the express terms of the contract itself; it chose to stand upon the wording of the contract rather than to meet contentions concerning its practical construction and operations under it.

ARCO is in similar position with respect to its claim that it never received comments forwarded by Wallace to FEA during that appeal proceeding. FEA regulations require parties submitting written comments to serve copies upon all parties. The FEA

---

priate procedures" for all such actions, "including hearing where deemed advisable", and making opportunity for hearing expressly mandatory only with respect to certain types of orders not pertinent in EPAA context. Cf. *Carpenters 46, et al. v. Construction Ind. Stab. Comm.*, 522 F.2d 637 (Em.App.1975); *Plumbers Local Union No. 519, et al. v. Construction Ind. Stab. Comm.*, 479 F.2d 1052 (Em.App. 1973); *Wentz Heating & Air Conditioning Co. v. FEA*, 410 F.Supp. 1155 (D.Neb.1976).

11. In the Wallace order the agency on appeal expressly held that the General Counsel was in error in his view that the written agreement itself established the wholesale purchaser-reseller relationship, and proceeded to base its decision upon the subsequent submissions of the parties as well as upon the written agreement. In the Boyett opinion it was indicated that similar practical experience under the agreement based upon the parties' submissions, including ARCO's, was considered.

had assumed that this was done, and the record contains no indication to the contrary except for ARCO's assertion. However, upon the point being raised, ARCO was informed that if it felt after reviewing copies which were then furnished that it had been unable sufficiently to state its position before, it could "certainly request the FEA to reconsider this matter by filing an application for modification or rescission . . . See 10 C.F.R. 205.130, et seq."

ARCO chose not to file such an application rebutting or questioning Wallace's submissions. It now suggests that one of the reasons it did not do so was because 10 C.F.R. § 205.135 indicated that to obtain such relief "significantly changed circumstances" would have to be demonstrated. Such overly close reading in view of FEA's express invitation hardly affords good reason for ARCO's refusal to question data submitted by Wallace. It seems more likely upon the whole record that the real reason for failure to negate the statements now questioned was ARCO's desire upon the denial of an evidentiary hearing to restrict the appellate ruling to the written contract itself, and its determination to stand as a matter of law upon its demand for such a hearing.[12]

There was no failure of the agency to disclose the facts on which it relied when rendering the Boyett and Wallace orders and no violation of any due process or other rights as contended by ARCO.[13] The orders on appeal indicated their bases, as to which ARCO had fair opportunity for input. The asserted right of cross-examination of those making statements involves substantially the same question as the claimed right to an evidentiary hearing, and fails with it.

■ The question of substantiality of the evidence in this administrative context turns upon the evidence actually before the agency, the claims which had been put at issue, those concerning which there had been no substantial issue raised, and upon the nature of the interpretations themselves. See, *International Brotherhood of Electrical Workers, Local 1466 v. Boldt, et al.*, 513 F.2d 1405 (Em.App.1975). The contracts together with the submissions by the parties to those contracts constituted substantial evidence supporting the FEA's issuance of the orders at the administrative appeal level.

In each instance the contracts furnished the framework as to which the actual practice of the parties emerged without any serious question except by way of inferences drawn by the agency in the appellate process, and by the appellant in expounding its position here. If the contracts themselves, which were admitted, did not establish the relationship in question, they furnished solid foundation for reasonable inferences, as practically interpreted, applied and extended in actual practice according to the showing made in the course of the administrative appeals. In the absence of a contrary showing by ARCO, the inferences drawn by the agency in light of its presumed disinterest and expertise likely would have to prevail even in the ordinary case invoking the well established rule of deference. Especially is this so in the type of case now before us.

We conclude that the procedures and evidential foundations were sufficient to warrant the interpretative orders in question.

---

12. We cite one example: On page 10 of ARCO's brief, reference is made to statements on behalf of Wallace that he had the right to negotiate and enter into and terminate sales agreements with customers except where credit terms were involved. ARCO argues that such contention is negated on p. 434 of the Record, but there can be found little more than an offer of "documentation at the hearing requested" by it.

13. ARCO also contends that it should have received copies of the results of FEA investiga-

tions of ARCO's relationships with its other distributors in connection with the issue of bulk-plant closures involved in *Spinetti v. Atlantic Richfield Co. and FEA*, 552 F.2d 927 (Em.App.1976), *supra*. It was held by the agency that this investigation had no relevance to Boyett's and Wallace's classification as wholesale purchaser-resellers in the interpretations. We do not think in the present context that ARCO was prejudiced by this ruling.

The only other ground ARCO suggests for setting them aside is the contention that the FEA does not possess authority to regulate ARCO's contractual relationships with its distributors through the Boyett order. As already noted, it does not question the validity of 10 C.F.R. § 211.51 and Energy Ruling 1975–8, *supra*, which guided and supported the conclusions arrived at by the agency upon the basis of the submitted facts. Our observations concerning the propriety of these submissions for the purpose leave little to this last point except a broad attack upon the allocation and related decisional authority of the agency which we have repeatedly rejected in principle [14] and have no hesitancy in doing so in present context.

Having sustained the validity of the interpretative orders in question against the attacks enumerated in appellant's brief, we are compelled by the issue of collateral estoppel to look more deeply into the inherent purpose and nature of such orders.

ARCO's complaint in the district court alleged that the FEA Regional Counsel had stated that other distributor-parties to such contracts as are here involved need not receive an individual interpretation because they could "rely on the basis of administrative *res judicata*" upon the Boyett order. The complaint in the present case further asserted that attempts had been made "on the basis of collateral estoppel in . . . *Spinetti v. Atlantic Richfield*, No. C–75–0324, N.D.Cal.1976, to prevent Atlantic Richfield from denying in essentially different context that certain individuals had the status of wholesale purchaser-resellers. . . ." ARCO's brief asserted that after deciding the Boyett appeal the agency initiated the practice of assigning new customers to ARCO commission distributors pursuant to 10 C.F.R. § 205.30, et seq., and threatened civil and criminal sanctions founded on the Boyett order. In his memorandum decision in *Spinetti*, Judge Peckham, having already upheld the Boyett in-

terpretation in the case now before us, perceptively noted "reservations concerning the extent to which that decision . . . precludes ARCO from further contesting the application of the Boyett interpretation to particular commission distributors whose exact manner of operation was not before the FEA." Judge Peckham, without further analysis, chose "not to rely on the Boyett proceedings alone" but upon the evidence in that record to support a similar conclusion.

The appellant ARCO, contending that "administrative collateral estoppel applies only to those administrative proceedings providing an adversary hearing", including opportunity to present evidence and to cross-examine, asks us to vacate the Boyett and Wallace Orders and to return this action to the district court with instructions to enjoin FEA from relying on the Boyett order in any other case. And counsel for the FEA insisted at oral argument before us that the Boyett ruling could be administratively applied in favor of all other distributors of ARCO without the necessity of further independent consideration of the problem.

There is thus pressed upon us for the first time the issue of the effect of these interpretations and orders by way of collateral estoppel or *res judicata* in other proceedings, administrative and judicial.

The type of cases brought to our attention by counsel involve orders essentially different than the interpretive orders before us; they deal with specific issues between designated parties in enforcement or other determinative proceedings. In that general context the prevailing rule is that administrative determinations may be given collateral estoppel effect between the parties and their privies if they are the result of fair adversary hearings and are supported by substantial evidence but that where these elements are lacking no such

---

14. See, e. g., *Basin, Inc. v. FEA*, 552 F.2d 931 (Em.App.1977), 3 CCH Energy Management ¶ 26,071, *supra; Condor Operating Co. v. Saw-* *hill*, 514 F.2d 351 (Em.App.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

effect should be accorded them.[15] Even where the administrative proceedings meet other criteria, however, it has been held that effect should not be attached collaterally to the result when it is sought to be applied in an essentially different context.[16]

█ The types of interpretations with which we are concerned, when applied beyond their narrow context, present additional obstacles to collateral estoppel, and in a sense to *res judicata*, from their very nature in the regulatory scheme.

In contrast to other procedures treated elsewhere in the same part of the regulations,[17] subpart F, § 205.80–205.86, headed "Interpretations" establishes procedures for filing formal requests for interpretations and for the consideration of such requests by the FEA. An interpretation pursuant to this subpart is issued only by the General Counsel or a Regional Counsel of FEA. The person making the request has the responsibility of submitting a full statement of the facts and relevant authorities on the basis of which he seeks the interpretation. Section 205.83. The FEA may investigate and accept statements from third parties, but the person making the request must have the opportunity for response. The primary basis of any interpretation is the information supplied by the person requesting the interpretation:

The FEA shall issue its interpretation on the basis of the information provided in the request, unless that information is supplemented by other information brought to the attention of the General Counsel or a Regional Counsel during the proceeding. The interpretation shall, therefore, depend for its authority on the accuracy of the factual statement and may be relied upon only to the extent that the facts of the actual situation correspond to those upon which the interpretation was based. [§ 205.84(a)(2).]

It is further provided in § 205.85:

(c) Only those to whom an interpretation is specifically addressed and other persons upon whom the FEA serves the interpretation, and who are directly involved in the same transaction or act may rely on it. No person entitled to rely on an interpretation shall be subject to civil or criminal penalties stated in Subpart P of this

---

15. See, e. g., *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers Local 150*, 436 F.2d 1064 (9th Cir. 1971); *Hollander v. Sears, Roebuck & Co.*, 392 F.Supp. 90 (D.Conn.1975); *Strip Clean Floor Refinish v. New York Dist. Counc. No. 9*, 333 F.Supp. 385 (E.D.N.Y.1971); *Old Dutch Farms, Inc. v. Milk Drivers Local 584*, 281 F.Supp. 971 (E.D.N.Y. 1968); *Eazor Express, Inc. v. General Teamsters Local 326*, 388 F.Supp. 1264 (D.Del.1975).

16. *Lewis v. IBM Corp.*, 393 F.Supp. 305 (D.Or. 1974).

17. Part 205 of 10 C.F.R. deals with "Administrative Procedures and Sanctions." Most of the administrative "actions" there addressed have directive, adjudicatory or enforcement impact upon particular interests. Thus, Subpart B deals with applications for adjustments modifying the base period volume or other measure of allocation entitlement. Subpart C, dealing with assignments, establishes procedures for obtaining an order that an authorized purchaser be supplied products at a specific entitlement level by a specified supplier. See *Basin, Inc. v. FEA*, 552 F.2d 931 (Em.App.1977), 3 CCH Energy Management ¶ 26,071, *supra; Atlantic Richfield Co. v. Zarb*, 532 F.2d 1363 (Em. App.1976). Cf. *Condor Operating Co. v. Sawhill*, 514 F.2d 351 (Em.App.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975), *supra.* Subpart D establishes the procedure for applying for an exception from a regulation or ruling or generally applicable requirement based on serious hardship or gross inequity. See *Amtel, Inc. v. FEA*, 536 F.2d 1378 (Em. App.1976); *Powerine Oil Co. v. FEA*, 536 F.2d 378 (Em.App.1976); *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *Pasco, Inc. v. FEA*, 525 F.2d 1391 (Em.App. 1975). Subpart E deals with procedure for prosecuting applications for exemptions from no less than a part or subpart of the regulation, to merge requirements if granted into a rulemaking procedure upon notice. Cf. *Crown Central Petroleum Corp. v. FEA*, 542 F.2d 69 (Em.App.1976). Subpart G establishes procedures for the filing of such other applications, petitions, or requests as may be required, including applications by motor gasoline retail sales outlets and petitions to use multiple allocations fractions in accordance with other provisions of the regulations. "Remedial Orders" of the agency frequently back up such decisions.

part for any act taken in reliance upon the interpretation, notwithstanding that the interpretation shall thereafter be declared by judicial or other competent authority to be invalid.

With regard to continued viability or finality of an interpretation, the limitations in § 205.85 of the regulation are explicit:

(d) An interpretation may be rescinded or modified at any time. Rescission or modification may be effected by notifying persons entitled to rely on the interpretation that it is rescinded or modified. This modification shall include a statement of the reasons for the rescission or modification, and in the case of a modification, a restatement of the interpretation as modified.

(e) An interpretation is modified by a subsequent amendment to the regulations or ruling to the extent that it is inconsistent with the amended regulation or ruling.

We hold that under these regulations such interpretations, even though affirmed on administrative appeal and sustained by judicial review, can have no collateral estoppel effect, as distinguished from persuasive force, except (1) as to the persons who are directly involved in the same transaction or act (§ 205.85(c)) and who were parties to the interpretation proceedings, viz., between ARCO and Boyett and between ARCO and Wallace; [18] (2) in relation to the immunity from civil or criminal penalties provided in "Subpart P" [19] for any act taken in reliance upon the interpretations by those to whom it has been specifically addressed and other persons upon whom FEA has served the interpretation and who are directly involved in the same transaction or act.[20]

For us to hold that the Boyett and Wallace interpretations would be binding on ARCO in the instances of other Boyett-like commission distributors and Wallace-like commission tank truck distributors would not benefit the FEA or any new distributor, since it will still be necessary for the FEA or any new distributor to prove that the factual situation as to each new distributor was identical to that of Boyett or Wallace. Since the FEA or the new distributor will have that task and burden there is no need to hold collateral estoppel exists as to ARCO in claimed Boyett and Wallace situations. Thus, *res judicata* application by FEA of the existing interpretations for their limited purposes in the event of future requests for interpretations by ARCO or other parties to the distributor agreements cannot be ruled out in principle; but we consider it inappropriate, divorced from a specific factual record, to anticipate and address specific problems of this nature which ARCO has only obliquely raised. Of course, interpretations are exceedingly helpful to interested parties and the public as indicative of the policy and reasoning of the agency, and their persuasive effect may widely transcend any binding force.

**18.** The majority of the panel would so indicate this specific limitation. My view is that for the narrow purpose of "reliance" and the corresponding immunity from civil or criminal penalties referred to in the regulation, we should not thus foster the appearance of foreclosing on the present record the possibility that ARCO's other "Commission Distributors", on whose behalf also the "Boyett Interpretation" was requested, could be beneficiaries of administrative *res judicata* in this respect, since that interpretation referred to distributors in Boyett's position, and there is no indication in the record that it was not "served" upon some or all of them. § 205.85(c).

**19.** Subpart P, under the heading "Investigations, Violations, Sanctions, and Judicial Actions", provides that "any person who violates any provision of this Chapter, or any Order issued pursuant thereto", shall be subject to penalties and sanctions as provided therein—these include criminal fines of up to $5,000 for each wilful violation and civil penalties of not more than $2,500 each for any violations. 10 C.F.R. § 205.203.

**20.** It would be a strange breed of collateral estoppel as to any issues beyond the right of "reliance" for parties to a controversy, or classes whom they purport to represent, to be bound among themselves by an interpretation of subordinate agency officials which could be administratively altered at any time on the same state of facts—for example, at the very moment the court was declaring the interpretation binding.

■ The affirmance of interpretations resting upon *ex parte* statements, although supplemented by submissions of other parties in an adverse position in the course of administrative appeal, did not extend the adjudicatory force of interpretations beyond the terms of the foundational regulation.[21] Otherwise, the interpretations even though administratively affirmed by "final agency action" were essentially advisory and thus not judicially cognizable.[22] They did not command anyone to do or refrain from doing anything. They did not grant or withhold any authority, privilege or license, except in the limited context referred to above. They did not otherwise abridge any power or facility. They did not change any existing or future status or condition. They were advisory opinions, salutary in the administrative context for the guidance of interested persons, and as an assurance against the possibility of specified criminal or civil penalties for future acts of those entitled to rely on them while the interpretations were subsisting, but not even purporting to create other immunities, rights, obligations or consequences.[23]

Because of the heavy pressures which FEA must meet as it interposes itself between countless parties in innumerable situations, we are loath to afford even an appearance of limiting unduly any means by which repetitive examinations of similar administrative problems can be avoided. Yet it would be basically wrong even to impliedly encourage the parlaying of these interpretations into essentially final resolutions of far-reaching issues and for undisclosed purposes with respect to only nominally involved parties never meaningfully engaged as to those issues or purposes, or into something akin to class actions without protections comparable to those provided in Rule 23, F.R.Civ.P.

■ It has been considered in the view we have taken whether interpretive orders of the kind involved here are judicially reviewable at all.[24] And we have concluded that for the very reason of the possible *res judicata* or collateral estoppel effect of the Interpretations in the narrow sense we have indicated, jurisdiction existed in the district court, and is vested here, to review them. Aside from their merely advisory or persuasive effects, the Interpretations may have extremely important consequences with respect to the issue of good faith reliance for future acts and the question of interim penalties referred to in the FEA regulations.[25] ARCO, the party aggrieved by the "final agency action" in this sense had the right to seek judicial review as it did.

The reviewability of the interpretations in question in their proper meaning is rendered clear by *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). As there said, "judicial review

21. The FEA has taken the position here, as it did in Gulf Oil Corporation, 2 FEA ¶ 80,624 (1975), that while the issuance of an interpretation is not an adjudicatory process in the first instance, an appeal of an interpretation is an adjudicatory proceeding. We do not question this statement in proper context. But it should be pointed out that the latter process with reference to an interpretation does not change the essential nature, purpose and limitations of the final interpretation as established by the regulations defining them.

22. *United States v. Los Angeles R.R. Co.*, 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927); *Helco Products Co. v. McNutt*, 78 U.S.App.D.C. 71, 137 F.2d 681 (1943). Cf. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *National Automatic Laundry and Cleaning Council v. Shultz*, 143 U.S. App.D.C. 274, 443 F.2d 689 (1971); *National*

*Van Lines v. United States*, 326 F.2d 362 (7th Cir. 1964); *American President Lines, Ltd. v. Federal Maritime Com'n*, 114 U.S.App.D.C. 418, 316 F.2d 419 (1963).

23. *United States v. Los Angeles R.R. Co.*, 273 U.S. at 309, 47 S.Ct. 413, *supra*.

24. It is our duty to determine that jurisdiction is present whenever the problem occurs even though the parties have not raised the issue. *Exxon v. FEA*, 516 F.2d 1397 (Em.App.1975).

25. Cf. *Hodgson v. Square D. Company*, 459 F.2d 805 (6th Cir. 1972); *United States v. Stocks Lincoln-Mercury, Inc.*, 307 F.2d 266 (10th Cir. 1962). Beyond recognizing the possibility of such an interest depending on developing circumstances, we do not now pass upon such immunity by virtue of the regulation cited, either as a matter of law or fact.

of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." The Administrative Procedure Act provides not only for review of "[a]gency action made reviewable by statute", but also for review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And the Economic Stabilization Act, 12 U.S.C. § 1904 note §§ 210, 211, as incorporated into the Emergency Petroleum Allocation Act, reinforces that right here.[26]

*Abbott Laboratories,* as well as *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689 (1971), *supra,* curiously neither of which were cited in the briefs or at argument, are dispositive both as to the proper reviewability of the interpretations in the narrow confines we have indicated, and in principle as to their non-reviewability beyond those confines. Both points are epitomized in the latter Wage and Hours case in which Judge Leventhal lists the circumstances held there to sustain reviewability, all of which are absent in the present case except with respect to the legal consequences we have already pointed out.[27]

In sum: The district court did not err in sustaining the FEA orders and interpretations as against ARCO's attacks. ARCO's case for an injunction against use of the orders and interpretations fails because based upon the mistaken theory that they were invalid and subject to vacation, and because, in any event, they may have *res judicata* or collateral consequences within the limits we have stated. And there appears no likelihood of undue extension of their effect beyond those limits in light of what has been observed here.

For the reasons stated, the judgment of the district court is AFFIRMED.

**26.** 210(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitation in 211), and/or damages.

211. The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title or under regulations or orders issued thereunder, notwithstanding the amount in controversy.

**27.** The *interpretation of the Administrator* "was a broad legal one based upon the underlying effect of amendments"; there was involved "a broad ruling on legal issues that are appropriate for court consideration" instead of "the kind of ruling that must wait and turn on developments of specific fact situations"; there was "no problem of identifying or refining pertinent facts insofar as the Court is called upon to consider the validity of the Administrator's interpretation"; "[t]here is no 'record' to be studied or made; for the only record involved in this issue is that established by such materials as the law and its legislative history"; there was involved a "controversy that was real and suitable for determination of the issue, suitable in such terms as the identity and reference points of the parties and the perspective they provide by their record", and based on something other than a hypothetical inquiry; the decision had finally been made by the head of the agency and not subordinates, the administrative inquiry had come to an end, and there was no fair basis in saying that the process would be disrupted by judicial review. *National Automatic* at 695–96.