**BASIN, INC., Plaintiff-Appellant,**

v.

**FEDERAL ENERGY ADMINISTRATION and Frank Zarb, Individually and as Administrator of the Federal Energy Administration, Defendants-Appellees.**

**No. 5–14.**

Temporary Emergency Court of Appeals.

Argued Dec. 2, 1975.

Decided April 6, 1976.

As Amended April 12, 1976.

Bruce G. Forrest, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before HASTIE, ANDERSON and JOHNSON, Judges.

HASTIE, Judge.

In the district court, Basin, Inc. sued Federal Energy Administration (FEA) to enjoin the enforcement of section 211.63 of the agency's regulations. Adopted in January, 1974, that section was the so-called "December 1 rule" that regulated the allocation of old domestic crude oil by freezing supplier-purchaser relations as they existed December 1, 1973.[1]

At a hearing on a motion for preliminary injunction, it appeared that Basin is a marketer of crude oil. A major part of a marketer's business is buying crude oil from producers and reselling it to refiners,[2] although most domestic crude oil is sold by the producer directly to a refiner. On December 1, 1973, Basin had been in business only two months. Before the freeze date it had obtained only small deliveries of crude oil under contracts with a few suppliers, and it was negotiating with others for additional quantities of oil.

Cecil E. Munn, Fort Worth, Tex., with whom H. Carter Burdette, Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, Tex., Northcutt Ely, Washington, D. C., John N. McCamish, Jr., and John D. Fisch, Matthews, Nowlin, Macfarlane & Barrett, San Antonio, Tex., were on the brief for appellant.

For a year or more, Basin complained without avail to FEA that section 211.63 operated unjustly in precluding it from establishing adequate sources of supply for its new enterprise. Then, on August 31, 1975, the regulations expired with the emergency legislation under which they had been issued.

1. "§ 211.63 Supplier/purchaser relationships.

"(a) All supplier/purchaser relationships in effect under contracts for sales, purchases, and exchanges of domestic crude oil on December 1, 1973, shall remain in effect for the duration of this program, except purchases and sales made to comply with this program: *Provided, however,* That (1) any such supplier/purchaser relationship may be terminated by the mutual consent of both parties; (2) the provisions of this paragraph do not apply to the first sale of crude oil pursuant to § 210.32 of this chapter; and (3) the provi-

sions of this paragraph shall not apply to the seller of any new crude petroleum or released crude petroleum, as defined in Part 212, if the present purchaser of such crude petroleum refuses, after notice by the seller, to meet any bona fide offer made by another purchaser to buy such crude petroleum at a lawful price above the price paid by the present purchaser." 10 C.F.R. (1975) § 211.63(a)

2. In its complaint, Basin alleges that marketers also provide other "valuable crude oil marketing services to crude oil producers . . . ."

Within a few weeks Basin contracted for and began to receive old crude oil from several new suppliers. But on September 29, 1975, the Emergency Petroleum Allocation Act of 1975, P.L. 94–99, became law. That statute reinstated the lapsed regulations, among them section 211.63, retroactive to their August 31 expiration date. For the purposes of this case, the effect of this was to invalidate all sales after September 9, 1975 to Basin from its new suppliers.

This led to the present suit and to the motion for a preliminary injunction that would allow Basin to receive oil under the September, 1975, purchase agreements until final disposition of this suit. On October 6, 1975, the district court granted the requested preliminary injunction, and FEA appealed. Thereafter, on motion by FEA, we stayed the preliminary injunction pending our final disposition of the appeal.

■ Essential to the preliminary injunction was the district court's conclusion that a substantial doubt existed whether the legislative reinstatement of § 211.63 could lawfully restrict future sales under contracts entered into before September 29. However, in *Condor Operating Co. v. Sawhill,* Em.App.1975, 514 F.2d 351, *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467, we rejected a contention that section 211.63 as originally promulgated could not validly preclude future sales under pre-existing contracts. By the same token, sales made after the Allocation Act of September 29, 1975, are not beyond the reach of that legislation merely because they occur in performance of agreements entered into before September 29.[3]

■ But the posture of this controversy has been changed by significant events that have occurred since October, 1975. Effective November 18, 1975, FEA has revised § 211.63, prefacing the amendment with an explanatory statement. 40 F.R. 54422, November 24, 1975. It is explained that the

amendment permits "the substitution of new resellers [marketers] of crude oil for present resellers,[4] provided certain conditions designed to protect the ultimate refiner of the crude oil were met". Moreover, in the explanatory statement it is explicitly recognized that in practical operation, the December 1 rule "has necessarily lessened the opportunity for competition in the marketing of crude oil and has effectively prevented new entrants from having significant access to price-controlled oil". As a corrective of this harsh consequence, the revised section 211.63(a) now permits a reseller to buy from a producer a quantity of crude oil that the producer has been selling to another reseller, but only if the refiner to whom the former marketer was selling the oil shall consent to this marketing change. Finally, in thus requiring the refiner's consent, FEA stated that it had considered and rejected an alternative that would require merely that the new marketer offer the oil to the refiner on terms no less favorable than the refiner's arrangements with the preceding marketer. *Id.*

Basin has strongly represented to us that the relationships, pressures and economic interests in the oil industry are such as to make this formal broadening of its access to producers practically meaningless. We view this issue as involving relevant questions of fact concerning Basin's present supply and its allegedly futile efforts to enlarge its supply that can most appropriately be resolved through an evidentiary hearing in the district court.

A more recent change in section 211.63 became effective, subject to review after 90 days, on February 12, 1976, in connection with the imposition of price controls on all, not merely old, domestic crude oil. 41 F.R. 7386, 7387, February 18, 1976. The freeze date for supplier-purchaser relations was changed from December 1, 1973, to January 1, 1976. But any member of the industry was declared eligible to become the pur-

---

**3.** We express no opinion about the validity of sales completed between September 1 and September 29.

**4.** We are told that about 10 per cent of the domestic crude oil supply is handled by marketers.

chaser in a first sale of domestic crude from a new oil producing property. Beyond that, as originally proposed by FEA in its notice of intended rule making, the new rule would have created similar open competition for oil produced from an old property in excess of that property's January 1, 1976, production level. However, the rule subsequently adopted did not contain this provision. Rather, it expressly restricted access to this increase to purchasers who were buying the output of the property on January 1, 1976. 41 F.R. 7387. With this rule FEA published an explanatory statement that justified the agency's change of position and rejection of the open competition it had proposed by stating that it had acted because "most firms commenting were of the opinion that . . . [the original proposal] would cause severe administrative difficulties in many cases". We are reluctant to believe that this means that severe administrative burdens on the federal regulatory agency are offered as a justification for eliminating competition for oil in excess of former production. On the other hand, it is difficult to believe that the administrative burdens a willing seller would bear are a reason for not allowing him to sell. In any event, FEA has had no opportunity to justify to a court this removal of all increase in production from competition among prospective buyers. This too merits original consideration at a hearing in the district court.

Finally, it appears that, pursuant to the mandate of section 454 of the Energy Policy and Conservation Act, Pub.L. 94–163, 89 Stat. 871, FEA is even now reevaluating its regulations. And one of the indicated motivating concerns that led Congress to require this reevaluation was the problem of opportunity for "crude oil purchasers and resellers who initiated business after the 1972 base period . . . to compete with others for the purchase of crude oil from producers . . . ." S.Conf.Rep.No.94–516, 94th Cong., 1st Sess., at 202, *U.S.Code Cong. and Adm.News,* 94th Cong., 1st Sess. (1975), p. 2043.

In sum, it appears that both FEA and Congress have recognized the disadvantaged position of newcomers like Basin under the crude oil allocation regulations. Beyond that, FEA has properly indicated that, in determining what corrective measures are warranted, this disadvantage must be weighed against the need to protect refiners from deprivation of their established crude oil supplies. But it is far from clear that the measures taken by FEA to ameliorate the plight of recent comers to the industry are of substantial practical value or that no reasonable and more effective measures can be taken without imposing unwarranted deprivations upon some refiners. Certainly, any governmental action that will effectively eliminate relatively recent comers from an industry calls for critical scrutiny and can be justified only by a clear showing of compelling circumstances.

Because of the changed posture of this controversy, we shall vacate the preliminary injunction and remand the cause to the district court for further consideration consistent with this opinion. If necessary to put in issue the effect and to challenge the reasonableness of the present provisions of section 211.63, the plaintiff shall be permitted to amend the allegations and prayers of its complaint. We believe an expedited hearing would be appropriate in order to enable the district court to determine promptly the relevant facts and whether FEA has unreasonably denied administrative relief that can properly be afforded the plaintiff without unwarranted sacrifice of other legitimate interests and public concerns.

It is so ordered. Our mandate shall issue forthwith.