BASIN, INC., Plaintiff-Appellee,

v.

FEDERAL ENERGY ADMINISTRATION and Frank Zarb, Individually and as Administrator of the Federal Energy Administration, Defendants-Appellants,

Independent Refiners Association of America, amicus curiae.

No. 5–21.

Temporary Emergency Court of Appeals.

Argued Jan. 21, 1977.

Decided March 7, 1977.

Bruce G. Forrest, Dept. of Justice, Washington, D. C. (Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Dept. of Justice, Washington, D. C., with him on the brief) for appellants.

Edwin Jason Dryer, Washington, D. C., for amicus curiae.

Cecil E. Munn, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex.; and Northcutt Ely, Washington, D. C., with him on the brief for appellee.

Before INGRAHAM, VAN OOSTERHOUT and JOHNSON, Judges.

JOHNSON, Judge.

This case involves the validity of 10 C.F.R. § 211.63, a regulation of the Federal Energy Administration (FEA hereinafter) commonly known as the "supplier-purchaser freeze" rule. In 1973, Congress passed the Emergency Petroleum Allocation Act [1] in response to problems that it perceived in the petroleum industry. A notable cause of these difficulties was the Arab oil embargo. The Act required FEA to allocate the distribution of domestically produced crude oil in pursuance of certain stated objectives, and Section 211.63 was promulgated by FEA for this purpose.

Section 211.63 has the effect, with the exceptions discussed later, of locking or freezing into place the supplier-purchaser relationships that existed before the freeze date of December 1, 1973. If a producer of crude oil had been supplying a certain reseller, or if the reseller had been supplying a certain refiner, then the "freeze" rule required that they continue to do so. A related, though smaller, program is the refiner regulatory ("buy-sell") program. It is designed to protect small independent refiners from large integrated ones which own their sources of supply. Under it, the independent refiners may compel the integrated companies to sell them petroleum, the exact quantity being determined by regulation.[2]

Plaintiff-appellee Basin, Inc., is a reseller of petroleum. It buys from domestic producers of oil and resells the same oil to refiners. The company was founded only two months before the Allocation Act became law. It had made arrangements for the purchase of a substantial quantity of petroleum, but it was deprived of about seventy-five percent of that supply by the supplier-purchaser freeze. Since that time, an apparently growing and profitable business has undergone economic stagnation.

Basin sought administrative relief for its problems, particularly a change in the FEA regulations. Some modifications were made, but Basin considered them to be unsatisfactory. It therefore instituted a suit in the Western District of Texas. The district court entered a preliminary injunction against FEA, based on doubt that the Allocation Act could abrogate contracts entered into before the freeze date. However, this Court found that particular issue already to have been settled in the agency's favor. It remanded for consideration of the extent to which Basin was foreclosed from the market by the contested regulation, and FEA's justification for any such result. *Basin, Inc. v. Federal Energy Administration,* 534 F.2d 324 (Em.App.1976).

Before trial, the Independent Refiners Association of America (IRAA) moved to intervene. The district court denied the motion and refused to permit IRAA's counsel to participate in the trial. Cases 5–20 and 5–22 involve appeals by IRAA from this denial of intervention. Because of this Court's disposition of the principal case, 5–21, it is unnecessary to reach the intervention issue.[3]

At the conclusion of the trial in which Basin and FEA participated, the district

---

1. 15 U.S.C. § 751 *et seq.,* as amended.

2. *See* 10 C.F.R. § 211.65.

3. Mr. Dryer, IRAA's counsel, represented to the Court in oral argument that IRAA would be satisfied with a reversal of the district court in 5–21, without consideration of the intervention issue. As this Court does reverse the district court in the main case, the intervention issue is

court found that a continuation of the freeze rule would drive Basin out of business and effectively foreclose any new entrants into the crude oil marketing field. It found the exceptions to the freeze rule to be "insignificant" and said that any hardship caused by the abolition of the rule could be compensated for under the buy-sell program. It further concluded that the regulation failed to advance three of the underlying policies stated in the Allocation Act, and thus that it contravened the statutory mandate. Because of these factors, the supplier-purchaser freeze rule was found to be arbitrary, capricious, and an abuse of discretion, and its enforcement against Basin was enjoined. From this judgment, FEA appeals.

▮▮▮ Of critical importance to this case is what standard the trial court should have applied in evaluating the FEA's regulation. This Court concludes that the regulation should have been upheld if it had any rational basis to support it. It is true that reviewing courts should not simply "rubber-stamp" the actions of administrative agencies. *NLRB v. Brown*, 380 U.S. 278, 291–292, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *see Federal Maritime Commission v. Seatrain Lines, Inc.*, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Volkswagenwerk v. Federal Maritime Commission*, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). However, the decisions of administrative agencies are not lightly disregarded. *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). To sustain an agency's statutory interpretation, it is not necessary to "find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be af-

firmed if it has a "reasonable basis in law." *Unemployment Compensation Commission of Alaska v. Aragon*, 329 U.S. 143, 154, 67 S.Ct. 245, 91 L.Ed. 136 (1946); *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). The attitude of this Court toward judicial review of economic controls has been along these lines. "It is a well settled principle that the courts place great weight on the interpretations given to statutes and regulations by those agencies charged with the responsibility of administering them." *Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council*, 481 F.2d 1388, 1392 (Em.App.1973). *See University of Southern California v. Cost of Living Council*, 472 F.2d 1065, 1068–1069, (Em.App.1972), cert. den. 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590.

Perhaps the decision most relevant to this case is *Condor Operating Co. v. Sawhill*, 514 F.2d 351 (Em.App.1975), cert. den. 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467. There, Section 211.63 was challenged by an oil producer. This Court stated, "Where the obvious intent of Congress is to give the President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, and regulations are fashioned to implement the Congressional mandate, the court should not interfere with the prerogative of the agency to select the remedy which for rational reasons is deemed most appropriate." *Id.* at 359. *See Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391 (Em.App. 1975); *Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council, supra; Reeves v. Simon*, 507 F.2d 455 (Em.App. 1974), cert. den., 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672; *Mandel v. Simon*, 493 F.2d 1239 (Em.App.1974); *University of Southern California v. Cost of Living Council, supra*. This standard is the proper one in the present case.[4]

▮▮▮ The problem remains whether the questioned regulation meets this rationality

moot and therefore it is not necessary to consider 5–20 and 5–22.

4. There appears to have been some confusion on the part of appellee with regard to a statement in the opinion of this Court when this

standard. The Emergency Petroleum Allocation Act specifies nine objectives which the FEA is to pursue in its regulations.[5] However, the objectives are broad and the FEA must be afforded substantial leeway in attempting to attain them. Each stated goal cannot be raised to the status of a mandatory requirement for each regulation, as the legislative history clearly shows. The House committee report states that the drafters were "careful to provide the President with adequate flexibility so that he is not straight jacketed into accomplishing these objectives in instances where it would be inimicable to the public interest." H.R. Rep.No.93–531, 93d Cong., 1st Sess. (1973), 1973 *U.S.Code Cong. & Ad.News,* p. 2590. The Conference Report says that it may be impossible to satisfy one objective without sacrificing the accomplishment of another. Conference Report 93–628, 93d Cong. 1st Sess. (1973), 1973 *U.S.Code Cong. & Ad. News,* p. 2688. Further, the statute itself says that the stated objectives are to be pursued "to the maximum extent *practicable.*" (Emphasis added). This indicates that a considerable degree of flexibility was intended by Congress and was incorporated into the Act. *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391 (Em.App. 1975).

In *Condor Operating Co. v. Sawhill, supra,* this Court held Section 211.63 to be a "rational exercise" of the power conferred by Congress. The regulation has been amended since that time, but Basin cannot demonstrate how the amendments make it less rational. Rather, it tries to distinguish *Condor* from this case principally on the basis of the district court's finding that new entrants, such as Basin, are barred by the regulation from the crude oil marketing

---

case was here before. That opinion stated, "any governmental action that will effectively eliminate relatively recent comers from an industry calls for critical scrutiny and can be justified only by a clear showing of compelling circumstances." *Basin, Inc. v. Federal Energy Administration,* 534 F.2d 324, 327 (Em.App. 1976). However, this dictum was made without the benefit of a full justification by FEA of its actions, and certainly cannot be interpreted as calling for a change in the standard of review of administrative action. In fact, the prior opinion emphasized that the case was being remanded for consideration of the *reasonableness* of FEA's action. *Id.* at 327.

5. (b)(1) The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

business. This factor, it contends, renders an otherwise rational regulation irrational.

 Assuming that new entrants are barred, the regulation may still be viewed as a rational attempt to implement the congressional mandate. The primary aim of the Emergency Petroleum Allocation Act is to deal with "existing or imminent shortages and dislocations in the national distribution system." Conference Report 93–628, 93d Cong. 1st Sess. (1973), 1973 *U.S.Code Cong. & Ad.News,* p. 2688. And Congress was particularly concerned with protecting small, independent refiners and marketers from large integrated companies. It is uncontested that the supplier-purchaser rule stabilizes the distribution system and greatly helps to protect the sources of supply of the small, independent refiners. That the trade association[6] of these refiners attempted to intervene in this case to save the regulation supports such a conclusion. Under these circumstances, it is rational for FEA to conclude that a measure which accomplishes one of the major goals of the Act is of such overriding importance that it is consistent with the statutory mandate, even if it does have the undesirable side effect of foreclosing the entry of new resellers into the industry.

 The district court found that Section 211.63 failed to effectuate three of the stated purposes of the Allocation Act. It said that the freeze rule failed to (a) foster competition in all segments of the industry, (b) provide for an equitable distribution of oil, and (c) minimize inflexibility and interference with market mechanisms. As indicated above, the FEA must be given considerable leeway in pursuing these objectives, and it can rationally argue that it is in fact effectuating those singled out by the district court as well as possible. The freeze rule is failing to foster competition in that it makes it more difficult for new entrants to come into the reselling business, but the freeze is encouraging competition greatly in that it protects the small independent refiners from the large integrated companies. Without this rule, or something

like it, there is considerable reason to believe that the integrated companies would severely restrict the ability of the independent refiners to compete. Conference Report, 93–628, *supra.* Thus it is rational for FEA to conclude that the freeze rule, on balance, promotes competition. Whether the rule causes an equitable distribution of petroleum depends in great part on how the term "equitable" is defined. The legislative history indicates that Congress intended for refiners to receive amounts equal to what they had historically received, if "practicable." Conference Report, 93–628, *supra.* This suggests that Congress considered it "equitable" for the refiners to have their sources of supply protected, which is what the freeze rule does. The rule therefore contributes to an "equitable" distribution of petroleum to a considerable extent, even if the share that Basin gets is not considered to be "equitable." It should be added that, when dealing with terms as broad and subject to conflicting interpretations as "equitable" is, deference to the agency charged by Congress with making that interpretation is especially appropriate. The district court found that the regulation did not minimize inflexibility and interference with the market mechanisms as the statute calls for. This essentially is true, because a mandatory allocation is by its nature an interference with the market mechanism. But Congress required a mandatory allocation. Further, the only alternative to the freeze rule suggested by either Basin or the district court was an extension of the buy-sell program. Adopting the buy-sell program would also involve the government in directing where oil should go, and thus could hardly be considered an improvement over the freeze rule in that regard. At least the freeze rule adopts the patterns that the free market has followed in the past, even if it does not permit the market to operate unhindered today. It is therefore clear that even in the three specific instances where the district court found that the freeze rule was not effectuating the statutory mandate, FEA has rational reasons for believ-

---

6. Independent Refiners Association of America, appellant in 5–20 and 5–22.

ing that it is in fact doing so. And as long as those reasons are rational, the regulation must be upheld.

 Basin claims that the small, independent refiners can be protected just as well by an extension of the buy-sell program as by a continuation of the freeze rule. The district court so found. However, it is quite reasonable for FEA to conclude otherwise. Expanding the buy-sell program, as suggested, would tremendously increase the number of transactions which FEA would have to conduct. Whenever an independent refiner needed crude oil, FEA would have to determine who was the nearest supplier with the right type and quantity of crude oil, and compel him to sell to the needy refiner. Thus, a government agency would have to make innumerable decisions as to the distribution of petroleum which in the past were made by the market mechanism. It is quite arguable that an agency could not do nearly as effective a job as the freeze rule does. Michael Paige, assistant general counsel for allocation for FEA, testified that it is "very difficult for a Federal agency to make judgments as to how to get crude oil to a needy smaller independent refiner." He said that there were problems under the buy-sell program at its present size, and that administration of a much expanded program would be "incredibly difficult." In fact, he found it "unbelievable" that any allocation plan other than the freeze could adequately do the job. Rather than trying to develop a complex new distribution pattern by agency fiat, FEA has frozen into place one that worked. Paige testified that "allocation as of a freeze date is a lot more effective provision than any administrative assignment procedure that we could ever manage." It is certainly reasonable to conclude that freezing into place a properly functioning system is more efficient than having a government agency design a vast new one. And deference to an agency's judgment is especially appropriate when the issue is the

ability of that same agency to perform certain tasks. Difficulties in administering the expanded buy-sell program involve more than simply irritating bureaucrats. To the extent the FEA fails to efficiently allocate petroleum, the shortages and dislocations which the Allocation Act was intended to prevent will be increased. In sum, FEA has rational reasons for concluding that no allocation program can protect the small independent refiners to the same degree as the supplier-purchaser freeze rule, and that it is therefore the approach which best achieves the congressional purpose.

It is true that the district court found that the buy-sell program could do just as effective a job of protecting the small independent refiners as the current freeze rule, and we do not specifically overturn that finding.[7] However, the issue is not what a court believes would be the most effective course. The issue is whether the course that FEA has adopted is "for rational reasons . . . deemed most appropriate." *Condor Operating Co. v. Sawhill, supra,* at 359. The district court does not appear to have measured Section 211.63 by this rationality standard. In any case, a correct application of that standard requires that the regulation be upheld.

Also supporting the reasonableness of the freeze rule are the seemingly substantial exceptions to it. All oil produced by stripper oil wells, twelve to fifteen percent of domestic production, is subject to no restraints, provided it is purchased for resale to a small refiner. All oil from new oil wells—wells which have not produced before—are free from restraint. If a new reseller fails to meet the offer, then the producer may switch customers. Of course, no offer may exceed the legal price ceiling. Another exception is that a substitution of one reseller for another is permitted if the refiner who has been receiving the oil agrees to the substitution. And finally, one reseller may replace another if he agrees to

7. The Court is constrained to note, however, that Michael Paige, an official experienced in administering the allocation program, testified to the contrary, and Basin has directed the Court to no evidence which contradicts his testimony.

supply the same refiner with the oil and charge no more for transportation and handling. In sum, if a reseller can pay the producer more or charge the refiner less, or if the refiner has no objection to the supplier's being changed, then Basin and other new resellers may replace old resellers. They may also obtain new oil and oil from stripper wells. This would seem to open up a lot of potential areas for new resellers. We do not overturn the district court's finding that new entrants to the business are foreclosed. But the exceptions to the freeze rule demonstrate an attempt by FEA to aid the new resellers, without harming the refiners. This further supports the reasonableness of FEA's approach.

Finally, Basin argues that Section 211.63 constitutes a taking of property for public purposes without just compensation, in violation of the Fifth Amendment. The district court made no such finding. In fact, the only effect that the regulation had on Basin was the incidental one of preventing it from making a profit in a very narrow area of the petroleum industry—the purchasing of domestic petroleum from independent producers and the reselling of it to independent refiners. Basin may engage in any other lawful activity. The government is not required to create or preserve business conditions which are favorable to a corporation in order to avoid taking property for public use. This Court has stated that "the Fifth Amendment prohibitions against the taking of property for public use without just compensation or due process of law refers only to direct appropriation and not to consequential injuries resulting from the exercise of lawful regulations." *Condor Operating Co. v. Sawhill, supra,* at 361. Basin's contention is without merit.

In upholding Section 211.63, this Court expresses no opinion as to the wisdom or efficacy of the questioned regulation. The judiciary does not comprise a higher administrative board charged with determining what agency action would be in the best interest of the nation. In cases such as this one, once it is determined that a contested regulation is a rational attempt to effectuate the congressional policy, the inquiry must be closed.

Accordingly, the judgment of the district court is

REVERSED.

**Independent Refiners Association of America, Applicant for Intervenor-Petitioner-Appellant.**