## PLACID OIL COMPANY

v.

## The FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator.

Civ. A. No. CA–3–77–1057–G.

United States District Court,
N. D. Texas,
Dallas Division.

Feb. 26, 1979.

A. B. Conant, Jr., Ray B. Williamson and Karen S. Bedell, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., Frank P. Saponaro, Jr., Morgan, Lewis & Bockius, Washington, D. C., for plaintiff.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Barbara Allen Babcock, Asst. U. S. Atty., Washington, D. C., Stafford Hutchinson, Asst. U. S. Atty., Dallas, Tex., Dennis G. Linder, Daniellia A. Sapriel, Dina R. Lassow, C. Max Vassanelli, Washington, D. C., for defendants; Jo Ann Scott, Dept. of Energy, Washington, D. C., of counsel.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This action for judicial review of a decision of the Federal Energy Administration (now the Department of Energy) reveals both the anomalous consequences that flow from pervasive federal regulation of a complex industry as well as the inherent difficulty of "substantial evidence" review of a somewhat intricate administrative proceeding.

The appeal by Placid Oil Co. is from the FEA's denial of its application for exemption from certain FEA regulations. Placid Oil is engaged primarily in oil and gas exploration, development, and production. On December 30, 1974, Placid Oil acquired through a wholly-owned subsidiary, Placid Refining Company, a small (36,000 bbls/day) refinery at Port Allen, Louisiana. Placid Refining thereafter undertook substantial capital improvements aimed at improving the efficiency of the operation of the refinery, with a view toward refining at Port Allen the type of crude produced by Placid Oil. Placid's goal of integrating its production and refining operations, however, has never been achieved due to the effect of FEA regulations from which Placid Oil seeks relief.

The principal FEA regulation which has frustrated Placid's effort to achieve a measure of integration is the so-called "December 1 Rule," part of the supplier/purchaser program set out at 10 C.F.R. § 211.63 (1978).[1] The December 1 Rule, promulgated pursuant to the Emergency Petroleum

---

1. The December 1 Rule took effect on January 15, 1974.

Allocation Act of 1973 (EPAA), provides that all contracts for the sale of domestic crude oil which were in effect on December 1, 1973 must remain in effect for the duration of the FEA's regulatory program regardless of their original terms, unless terminated voluntarily by both parties to the contract. (The regulation now refers to contracts in effect on January 1, 1976). On December 31, 1973, Placid Oil was selling all of its crude production to other firms under various contracts, the terms and operation of which were effectively frozen by the December 1 Rule. Likewise, all of Placid's production was under contract for sale to other firms on January 1, 1976. Consequently, Placid Oil may not sell the crude oil it produces to the Placid Refining Company.

Placid Oil also seeks exception relief from certain provisions of the FEA's buy/sell program, 10 C.F.R. § 211.65 (1978), also promulgated pursuant to the EPAA.[2] That program, though it has been substantially modified in recent years, essentially requires certain specified large refiners with ample supplies of crude oil to sell a portion of those supplies to small refiners. The regulations include a formula for determination of the price at which such sales must be made and, until March, 1976, permitted sellers to charge a handling fee of $.30 per barrel. That handling charge was reduced in March, 1976, along with substantial changes in the pricing formula. Placid Refining obtained its supply of crude through the buy/sell program until February, 1978, when it became cheaper to obtain crude in the open market due to changes in the regulatory pricing formula.

As a consequence of FEA regulatory programs, then, Placid Oil was not permitted to sell its crude oil production to its refining subsidiary, but rather was required to sell it to other firms at a regulated price well below the world market price (most of Placid Oil's production was "old oil" as defined by FEA regulations and hence had to be sold at the lower tier controlled price prescribed for old oil). At the same time, Placid Refinery was forced to obtain its supply of crude oil under the buy/sell program, paying for several years the seller's average cost of crude oil plus a $.30 per barrel handling charge, and later paying the seller's average cost of imported crude plus a $.05 per barrel handling charge.[3] In fact, some of the firms to which Placid Oil was selling crude were the same firms from which Placid Refining was purchasing crude at a higher price that included a handling charge. Largely as a result of the impact of the regulatory programs, Placid Refining sustained either a loss or a slight profit in its first year of operation.[4]

On December 5, 1975, Placid Oil filed with the FEA an application pursuant to 10 C.F.R. §§ 205.50–205.58 for exceptions to the December 1 Rule with respect to its short-term crude oil sales contracts and to the $.30 handling charge provision of the buy/sell program with respect to the crude oil purchased by the refinery under that program. The portion of the FEA regulation governing exceptions particularly relevant here is 10 C.F.R. § 205.55(b), which provides in part:

(2) An application for an exception may be granted to alleviate or prevent serious hardship or gross inequity . . .

(3) An application for an exception shall be decided in a manner that is, to the extent possible, consistent with the dispo-

---

**2.** The EPAA, and, consequently the regulatory programs promulgated pursuant to it, were originally scheduled to expire in February, 1975. But in December, 1974, Congress extended th statute's operation until August 31, 1975 an t was later extended to September 30, 1981.

**3.** The extent to which the adverse impact of the regulations upon Placid Refining has been mitigated by the small refinery bias of the Crude

Oil Entitlements Program, 10 C.F.R. § 211.67 (1978) is not disclosed by the record.

**4.** At the time of Placid's application for relief, the projected loss for the first year of refinery operation (1975) was approximately $2,700,-000, including depreciation expense. This figure was later revised to show a small profit. Placid's 1976 net profit for refinery operations was $2,633,276, which Placid claims reflects a mere 1.9% return on investment.

sition of previous applications for exception.

Following Placid's application for exception relief, the FEA notified those firms that would be affected by the granting of an exception to Placid—the firms receiving crude oil from Placid—of the filing of the application. Nearly all of these firms objected to the granting of an exception and contended that they would be adversely affected by such action. One firm, Shell Oil Company, indicated that it had no objection to the granting of the relief requested by Placid so long as its own obligations under the buy/sell program were reduced by the amount it was receiving from Placid, in accordance with the FEA decision in *Continental Oil Co.*, 2 FEA ¶ 80503 (January 7, 1975).

The FEA's Office of Exceptions and Appeals issued a decision on April 9, 1976 denying Placid Oil's application for exception. Placid's appeal from this decision pursuant to 10 C.F.R. § 205.100 *et seq.* was denied by the FEA on September 8, 1976. Finally, after its request for a reconsideration of the appeal was denied, Placid Oil commenced this suit on August 3, 1977 for review of the FEA's action.

Placid Oil argues here that the FEA's decision denying an exception was arbitrary, discriminatory, and an abuse of discretion because the decision is contrary to the FEA's decision in *Louisiana Land and Exploration Company*, 2 FEA ¶ 83,339 (October 22, 1975), *modified*, 3 FEA ¶ 80,586 (February 26, 1976) (*LL&E*). Placid contends further that the FEA decision was not supported by substantial evidence, and that the FEA failed to properly distinguish the *LL&E* decision and failed to properly consider evidence introduced in the administrative proceeding. Placid has moved for partial summary judgment with respect to these contentions, and FEA has filed a cross-motion for summary judgment.

Placid argues in the alternative that if the FEA's decision was correct under existing regulations, then the December 1 Rule is unconstitutional under the Fifth Amendment, both on its face and as applied to Placid, in that it works a deprivation of property without just compensation. Finally, Placid argues that, if the FEA decision is correct under the regulation involved, those regulations are in excess of the agency's authority. The FEA has filed its own motion for summary judgment with respect to the latter two arguments, and Placid has opposed that motion. Placid seeks both injunctive and monetary relief.

### Analysis

#### 1. The Standard of Review.

Judicial review of FEA decisions is provided by section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1) (1976) which in turn refers to the judicial review provisions of the Economic Stabilization Act, 12 U.S.C. § 1904, note § 211. That section provides in part as follows:

> . . . no regulation of any agency exercising authority under this title shall be enjoined or set aside, in whole or in part, unless a final judgment determines that the issuance of such regulation was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful under the criteria set forth in section 706(2) of title 5, United States Code . . . and no order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

The standard for review of FEA decisions under this provision have been defined largely by the Temporary Emergency Court of Appeals, which has exclusive jurisdiction of appeals from district courts involving regulations and orders issued pursuant to the EPAA. While the search for a durable standard for review of complex administrative decisions has often been an exercise in linguistic game-playing sometimes involving nonsensical semantic distinctions, the TECA appears to have applied a narrow standard with consistency. In *Basin, Inc. v. FEA*, 552 F.2d 931 (Em.App.1977), the court in reviewing a challenge to the validity of

the December 1 Rule held that "the regulation should have been upheld if it had any rational basis to support it," though it went on to note that "reviewing courts should not simply 'rubber-stamp' the actions of administrative agencies." 552 F.2d at 934. In *Powerine Oil Co. v. FEA,* 536 F.2d 378 (Em.App.1976), involving like this case an appeal from denial of exception relief, the court reiterated the "rational basis" test, and wrote as follows with respect to applications for exceptions:

> The necessity of making "rough accommodations" to implement and effectively administer the "complex program necessary to deal with the petroleum industry" has warranted "special attention" by this court to the rule of deference when it is faced with reviewing agency action which grants or denies exception relief to parties based on a case-by-case determination of the effect of the application of agency regulations to that party (citations omitted). 536 F.2d at 385–86.

This same standard has been applied in other TECA decisions. In *Pasco, Inc. v. FEA,* 525 F.2d 1391 (Em.App.1975), for instance, the court wrote that

> [a]dministrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them. . . . 525 F.2d at 1404.

*See also Mapco, Inc. v. Carter,* 573 F.2d 1268 (Em.App.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978); *Cities Service Co. v. FEA,* 529 F.2d 1016 (Em.App.1975).

■ Despite the narrow standard, the Emergency Court of Appeals has on occasion found an FEA decision to be "arbitrary, capricious, discriminatory" and "not supported by substantial evidence," *Husky Oil Co. v. DOE,* 582 F.2d 644 (Em.App.1978), particularly where the agency has failed to follow its own rules and decisions. Moreover, it is settled that an agency may not apply its rules in a discriminatory manner. *Marco Sales Agency v. FTC,* 453 F.2d 1 (2d

Cir. 1971). Finally, review of the FEA decision here is limited to those grounds considered by the agency in support of its decision. *Tabor v. Joint Board for the Enrollment of Actuaries,* 185 U.S.App.D.C. 40, 566 F.2d 705 (1977).

### 2. *The FEA Decision.*

■ In its application for exception before the FEA, Placid sought to terminate approximately 20 contracts that had been "frozen" under the December 1 Rule so that it could use the crude oil subject to those contracts in its own refinery. Placid also sought relief from the handling fee charged it by sellers under the buy/sell program. In support of its application, Placid argued that its refinery was "the only refinery in the United States that has been totally dependent upon the allocation program for its crude oil supplies until June 1975" (AR 31); that it had anticipated use of its own crude oil in the refinery either upon voluntary termination of its production supply contracts or upon expiration of FEA regulations; that because of FEA regulations, its crude oil costs were higher than the national average; that the market served by Placid Refinery was one in which prices were significantly lower than average; that the FEA regulations had caused the refinery to operate at a loss during the first nine months of operation; and that the granting of the requested relief would permit Placid Refinery to operate at a moderate rate of return. In addition, Placid argued that the EPAA itself supported the granting of the requested relief, in that one of the nine stated objectives of the Act is to preserve an

> economically sound and competitive petroleum industry, including the priority needs to restore and foster competition in the producing and refining . . . sectors of the petroleum industry, including independent refiners, small refiners . . . 15 U.S.C. § 753(b) (1976).

Placid argued further that prior FEA decisions, especially the decision in *Louisiana Land and Exploration, supra (LL&E)* mandated acceptance of the application for ex-

ception. Finally, Placid argued that the grant of the relief requested would not significantly harm those firms to whom it was then selling its crude oil.

In denying the application, the Office of Exceptions and Appeals found that Placid Refinery's economic viability was not threatened, that financial data with respect to the company's full range of operations was relevant to disposition of the application,[5] and that the *LL&E* case was distinguishable from this case in seven important respects. In its decision in the administrative appeal, the FEA essentially reiterated the reasoning of its earlier decision.

Analysis of Placid's attack upon the FEA decision is best made in two steps. First, the FEA decision will be viewed only in the context of the statutes and regulations involved. Second, the effect of prior FEA decisions will be analyzed.

The first step presents little difficulty. Viewed in isolation from earlier FEA decisions, the decision here is based on substantial evidence, and is neither arbitrary nor discriminatory. Congress' mandate to the FEA as reflected in the language of the EPAA is a complex and inherently flexible one, and the agency must be given broad latitude in carrying it out. While Placid points to the fact that one of the express purposes of the act is to promote competition in all sectors of the petroleum industry and to preserve the economic viability of small refineries, that is only one of nine objectives set forth at 15 U.S.C. § 753 which are to be achieved "to the maximum extent practicable." The very nature of the legislation contemplates substantial administrative flexibility. *See Consumers Union v. Sawhill*, 525 F.2d 1068 (Em.App.1975). In light of the agency's finding that Placid

Refinery was economically sound and was not threatened with irreparable harm, its failure to find either gross inequity or serious hardship and its consequent denial of relief cannot be called either arbitrary or discriminatory, considered without regard to prior FEA decisions.

The gist of Placid's complaint, however, is that the decision was arbitrary and discriminatory because the FEA departed unjustifiably from its own prior decisions. The Emergency Court of Appeals has held that it is "of paramount importance that the [FEA] adhere to its own announced rules." *Delta Refining Co. v. FEA*, 559 F.2d 1190, 1199 (Em.App.1977). In support of its decision here, the FEA attempted to distinguish several of its prior decisions. The question that this court must resolve is whether the distinctions made by the FEA are rational, principled distinctions, or whether they are distinctions without a difference.

Placid's first argument is that the FEA arbitrarily departed from its decision in *Delta Refining Co.*, 2 FEA ¶ 83,275 (September 11, 1975) in considering Placid's consolidated financial data rather than focusing exclusively upon data concerning refining and marketing operations. *Delta* involved an application for exception relief from the Entitlements Program, 10 C.F.R. § 211.67 (1978).[6] In setting guidelines for granting exception relief from the program, the FEA held that only a firm's refining and marketing operations should be considered in such cases, because inclusion of production data would "distort the financial portion of the refining and marketing operations and serve as a disincentive to the expansion of production activities" in contravention of the express policy of the EPAA. 2 FEA at 83,882. In a recent

---

5. Placid refused to submit financial data concerning the company's production activities, so that the FEA's initial review was limited to financial data concerning refining operations despite the Agency's ruling that the company's full financial data were relevant to proper disposition of the application. At the administrative appeal, however, Placid did submit its consolidated financial data.

6. The entitlements program is designed to alleviate crude oil cost differentials between refineries with varying degrees of access to lower-priced domestic crude oil. Under the program, refineries must in effect purchase the right to process a proportionate amount of low-cost crude greater than the national average from refineries that process a percentage of imported crude greater than the national average.

appeal from a denial of full exception relief from the entitlements program, the Emergency Court of Appeals found that the agency had erred in considering consolidated financial data:

> The agency's inclusion of such information in the case of Husky, a producer-small refiner, was contrary to its stated policy of avoiding "disincentives to the expansion of production activities." [citing *Delta*]. *Husky Oil Co. v. DOE,* 582 F.2d 644, 651 (Em.App.1978).

In the decision under review here, the FEA held that Placid's consolidated financial status was relevant in deciding the application for exceptions and distinguished *Delta* on the ground that the "refining and marketing operations only" rule announced there applied only to applications for exception from the entitlements program. The entitlements program, FEA argues, applies exclusively to refiners, whereas the December 1 Rule from which relief is sought here involves production operations. While the factual basis of the distinction is certainly true, the question here is whether the distinction is a meaningful one.

First, it is significant that the rationale for the rule announced in *Delta* is applicable to cases involving the December 1 Rule. The holding in *Delta* that only refining and marketing operations should be considered in deciding applications by the relatively few small refiners that were also producers was rooted in a policy of encouraging expansion of production activities and in a concern for the potentially severe impact of the entitlements program upon small refiners with substantial access to domestic crude who would have to expend large sums to purchase entitlements and who might be unable to pass those costs on to product customers. The chief concern of the FEA was that if consolidated financial data were considered in determining applications for relief from the entitlements program, a small refiner-producer might be concerned that expansion of production activities and

consequent increase in overall firm profits might lead to denial of an application for exception to entitlements requirements and might therefore impair the financial performance of refining operations. That same possibility exists here. If a small producer-refiner knew that the FEA would consider consolidated financial data in deciding whether to grant an exception to the December 1 Rule, that knowledge might create a disincentive to expansion of production facilities. Thus the FEA's distinction cannot be supported on the ground that the rationale of the *Delta* rule does not apply to applications for exception to the December 1 Rule.

It is important to remember, however, that the policy of encouraging expansion of production activities is just one of several objectives that the FEA is charged to pursue "to the maximum extent practicable." The FEA decided here that while that particular objective mandated exclusion of consolidated financial data where applications for exception to the entitlements program were involved, it did not mandate a similar rule with regard to relief from the December 1 Rule and the buy/sell program. In view of the complexity of its administrative task, the FEA must be given considerable flexibility in its pursuit of the goals of the EPAA. *Basin, Inc. v. FEA, supra.* It was not irrational for it to conclude that, while the objectives of the Act require consideration of only refining and marketing activities where the entitlements program is concerned, they did not mandate a similar rule where the December 1 Rule and buy/sell are involved.[7]

The aim of the entitlements program is to alleviate crude oil cost differences among refiners with varying degrees of access to low-cost domestic crude. The program applies only to refiners, and, as the FEA recognized in *Delta,* it is capable of working severe hardship upon small refiners who process primarily domestic crude oil.

---

7. One of the objectives of the EPAA involved here but *not* directly involved in cases involving the Entitlements Program is the goal of "the allocation of . . . crude oil to refiner-

ies in the United States to permit such refineries to operate at full capacity." 15 U.S.C. § 753(b)(1)(E) (1976).

The December 1 Rule, on the other hand, is aimed principally at achieving an equitable allocation of crude oil supplies. Given this variance of purpose between the December 1 Rule and the Entitlements Program, the factors governing applications for exceptions to the regulations can be expected to be different.

Moreover, Placid is here seeking relief from regulations that affect the relationship between its production and refining operations. That is, Placid seeks relief from a regulation imposed upon its production activities because of the resultant effect upon its refining activities. In *Delta* and *Husky,* on the other hand, relief was sought from a program that affected only refining activities, on the grounds of their adverse effect upon those refining activities. The injury suffered in those cases was a direct result of the regulatory program from which relief was sought, while the injury suffered here results from the regulatory program *and* the fact that Placid is both a producer and a refiner of oil. Thus while it was possible in *Husky* and *Delta* to consider the applicant's refining activities in isolation, that is not possible here because it is Placid Oil, an oil producer, that seeks relief from FEA regulation. In light of the significant differences between the regulatory programs involved and the facts of the cases, the FEA's application of a rule different from that applied in *Delta* was neither irrational nor arbitrary nor discriminatory.[8]

In further support of its argument that the FEA arbitrarily departed from its own rules and decisions, Placid argues that the FEA's decision in *Louisiana Land and Exploration, supra,* should have dictated a contrary decision by the agency here. This is a much more substantial argument than the

allegedly unsupportable departure from *Delta.* In fact, the validity of the FEA's distinction of *LL&E* is the analytical key to the resolution of this case. Before considering that decision, however, it is useful to examine the grounds upon which FEA has in the past granted exceptions to the December 1 Rule.

Applications for exceptions have been granted where a firm has invested substantially in new refining capacity in reasonable reliance upon the availability of a supply of crude oil but has later found the anticipated supply unavailable due to the operation of the December 1 Rule and has been unable to obtain supplies elsewhere. In such cases the FEA has found gross inequity and has granted relief. Other factors have been considered, such as the national policy of preserving the economic life of independent refiners, but the analytical focus has been reliance and financial harm due usually to the inability to obtain an adequate supply of crude oil. In *Famariss Oil and Refining Co./Navajo Refining Co.,* 1 FEA ¶ 20,629 (July 22, 1974), for instance, exception relief was granted to firms that had constructed new and expanded refinery facilities before the promulgation of FEA regulations in reliance upon a crude oil supply agreement with the State of New Mexico. The agency found that the loss of the anticipated supply would have jeopardized the operation of the new refineries in a manner contrary to the national policy of encouraging the expansion of domestic refining capacity, and granted exceptions to the December 1 Rule. The same result was reached under similar circumstances in *Saber Refining Co.,* 1 FEA ¶ 20,736 (December 13, 1974).

In *LL&E,* the FEA, while it found that neither *Saber* nor *Famariss* was directly

---

8. The decision of the Emergency Court of Appeals in *Husky* does not, as Placid argues, require a different result. The court there found that the agency acted arbitrarily in not following its own rule concerning use of financial data in deciding applications for exceptions to the entitlements program, but it did not hold that that rule applied in cases involving regulations other than the Entitlement Program regulations.

Moreover, the fact that all applications for exceptions are governed by the same regulation does not, as Placid contends, require that the same factors be applied in each case. The criteria prescribed by the regulation—"gross inequity" and "severe hardship"—are inherently flexible terms that cannot be measured in precisely the same manner in all contexts.

applicable, granted exception relief to an applicant similar in many respects to Placid. LL&E was a producer of oil that decided to enter the refining sector of the industry. In early 1973 the firm initiated plans for construction of a 30,000 barrel per day refinery. The refinery was designed specifically to refine the type of oil—Jay crude—that LL&E produced. Construction of the refinery was begun in October, 1974 and completed the following September. Because of the December 1 Rule, however, LL&E was required to sell its Jay crude to Exxon, and was not permitted to use it in its own refinery.

In considering LL&E's application for exception from the December 1 Rule, the FEA (in its final decision issued February 26, 1976) found that LL&E had not demonstrated the type of reasonable reliance shown by the applicants in *Famariss* and *Saber,* because of the timing of its expenditures in relation to the promulgation of the December 1 Rule. Nonetheless, the agency found that a gross inequity existed and granted relief to the extent required to afford LL&E a supply of Jay crude equal to the national average supply-to-capacity ratio. Relief was granted on several grounds:

1. LL&E was producing Jay crude before promulgation of the December 1 Rule.

2. LL&E was continuing its production efforts and would use its Jay crude production in its own refinery but for the operation of the December 1 Rule.

3. Before promulgation of the rule, LL&E "planned and took initial steps to build a refinery, on the basis of its ownership of the Jay crude oil field."

4. The refinery was designed to operate efficiently only with Jay crude as feedstock.

5. LL&E "committed significant financial resources to the construction of the refinery prior to the promulgation of the December 1 Rule."

6. "LL&E continued construction of its refinery without interruption from 1973 until the facility was completed in late 1975."

7. The construction of the refinery advanced the national policies of expanding domestic refinery capacity and fostering competition in the refining sector of the industry.

The FEA also noted that any adverse impact upon LL&E's crude oil customer, Exxon, could be remedied by means of a partial exemption from requirements of the buy/sell program granted to Exxon under the rule of *Continental Oil Co.,* 2 FEA ¶ 80,-503 (January 7, 1975), and should not preclude the grant of relief to LL&E. Finally, there is no indication that the agency considered financial data other than that relating to LL&E's refining operations.

In its decision denying exception relief to Placid, the FEA distinguished *LL&E* on several grounds. First, the agency found that Placid had not made financial commitments toward a new refinery before the promulgation of the FEA regulations to the same extent as LL&E had. Specifically, the agency noted that Placid did not purchase its refinery until December 30, 1974, nearly a year after promulgation of the regulations. The agency rejected Placid's contention that it had expended millions of dollars in anticipation of commencing refining operations:

> [T]he firm at one time may have planned to construct a refinery but abandoned those plans in favor of purchasing the Port Allen refinery facility and did so with full knowledge of its rights and obligations under the applicable FEA regulations.

The FEA further distinguished *LL&E* on the grounds that Placid's refinery was "not specifically designed to refine the crude oil which Placid produces;" that "no showing has been made that Placid has been unable to locate alternate sources of supply of crude oil;" that Placid submitted no evidence that use of the type of crude oil currently available to it "will significantly reduce its operating efficiency" or that "additional expenditures are required in order to process this available crude" (adopted from opinion issued December 5, 1975); and, finally, that "Placid has submitted no convincing evidence that the continuation of its processing of the crude oil currently

available to it will adversely affect the refinery's economic viability" (adopted from opinion issued December 5, 1975). Placid challenges each of these grounds as either arbitrary or not supported by substantial evidence.

The task of determining upon the basis of a lengthy, opaque administrative record whether the various findings of the agency are supported by substantial evidence is at best a treacherous one. This court's assessment of the record and of the FEA's decision is that, while there are several inconsistencies between the FEA's decision here and the *LL&E* decision, the agency's distinction of the *LL&E* case can be supported on two of the grounds advanced, and that, further, these grounds of distinction are of sufficient substance that the FEA's decision cannot be called arbitrary or discriminatory, is supported by substantial evidence, and should therefore be affirmed.

First, it is significant that Placid purchased a refinery nearly a year after the effective date of the December 1 Rule, whereas LL&E constructed a refinery for which it had made significant financial commitments before the regulations were promulgated. While Placid strenuously objects to this distinction on the grounds that it spent millions of dollars in anticipation of constructing a refinery at another site, those expenditures were not directly related to the refinery eventually purchased. Thus the actual purchase of the refinery by Placid was, in a sense, an independent business action taken with knowledge of the existence of the FEA regulations. While that distinction is not a wholly satisfying one, and seems slightly unfair, it cannot be called either arbitrary or discriminatory. The FEA is charged with a difficult regulatory task, and it must be permitted to make technical distinctions so long as those distinctions are not arbitrary, particularly where it is applying such diaphanous criteria as "severe hardship" and "gross inequity." While there may not be a significant qualitative difference between Placid's reliance on the availability of its own crude oil production and LL&E's reliance, there is

at least a difference of degree sufficiently substantial that the FEA's distinction of the cases on this ground cannot be called arbitrary.

The other, perhaps more meaningful ground of distinction advanced by the agency rests on the different degrees of specificity in the designs of the refineries. LL&E's refinery was designed specifically for the Jay crude produced by the firm, and the refinery could operate on other types of crude only after expensive alterations and at significantly reduced efficiency. Moreover, there was evidence that LL&E was unable to obtain Jay crude in the open market or through the buy/sell program. Placid's refinery, however, while designed to refine the type of crude produced by Placid, is capable of refining other types of crude without additional expenditures and without substantial loss of efficiency. Moreover, it appears from the record that Placid, unlike LL&E, *was* able to obtain the type of crude for which its refinery was designed through the buy/sell program. Thus the hardship that would have been suffered by LL&E by virtue of denial of its application was greater than that suffered by Placid. Again, that is not a distinction of resounding significance, but neither is it arbitrary or irrational.

There are several significant unexplained inconsistencies between the agency's reasoning in the two cases. First, the agency in its *Placid* decision departed from its conclusion in LL&E that adverse impact upon the applicant's crude oil customers was not a factor to be considered in deciding an application for exception from the December 1 Rule. This, however, was not a factor to which the agency ascribed great importance, and the discrepancy is not so significant as to render the agency's decision either arbitrary, irrational, or unsupported by substantial evidence.

A far more difficult problem is presented by the agency's consideration here of Placid's consolidated financial data. While, as discussed above, this course was not prohibited by *Delta Refining Co., supra,* as *Delta* involved only the Entitlements Program,

the FEA does not explain here why it considered Placid's consolidated financial data while it had apparently considered only refinery financial date in *LL&E*. The question that must be resolved is whether that inconsistency renders the FEA's decision here arbitrary and unsupportable. That question can be resolved into three separate but logically interdependent inquiries. First, it must be determined to what extent, if at all, the *LL&E* decision can be viewed as establishing a rule that in applications for exception from the December 1 Rule only financial data relating to refining operations may be considered. Second, if such a rule was established, it must be determined whether the agency violated it in the decision under review here. Finally, if a rule was established in *LL&E* and the agency deviated from it here, this court must determine whether that deviation was so demonstrably non-determinative of the agency's decision as to escape the usual rule that an administrative agency must consistently apply its own rules.

The first inquiry is whether the FEA in *LL&E* established a rule that in deciding applications for exception from the December 1 Rule only financial data relating to refining operations may be considered. It should be noted at the outset that such a rule would not be wholly logical, in view of the fact that the December 1 Rule applies as directly to production operations as it does to refining operations; its effect is upon contractual relations between producers and refiners. In fact, there might conceivably be a case where a producer applied for exception relief from the December 1 Rule solely because of its effect upon its production operations. In such a case it would be irrational to consider only financial data that related to refining operations.

In the *LL&E* decision the FEA did not explicitly hold that only refinery operation financial data should be considered in determining applications for exception from the December 1 Rule. In fact, the question of the range of financial data to be considered was not discussed at all.

It is true, on the other hand, that the *LL&E* decision indicates that the FEA considered only refinery financial data, and not consolidated data in reaching its decision. The question of whether this feature of the *LL&E* decision establishes a rule that must be followed in later decisions turns essentially on the extent of the freedom of action that an administrative agency should be allowed. On the one hand, given the magnitude and importance of decisions entrusted to such agencies, it is desirable to impose a strict standard of consistency upon agency decisions. On the other hand, to view every aspect of every agency decision as the establishment of a rule binding upon the agency in its future decisions would be to severely restrict the agency's range of action and undermine its effectiveness.

█ It cannot be said that the FEA in *LL&E,* simply because it did not consider consolidated financial data, established a rule that consolidated data were never to be considered in determining applications for exception relief from the December 1 Rule. The agency in that case was confronted with a case where a refiner-producer had invested substantial sums in a refinery designed specifically to process company-produced crude oil. The agency found that the application of the December 1 Rule to LL&E worked a gross inequity upon the company, and it apparently concluded that that determination could be reached without resort to a study of the company's consolidated financial data. Here the agency apparently saw what it considered to be a closer case concerning exception relief, and it determined that consolidated financial data should be considered in reaching a final decision. To be sure, the agency should have given reasons for its consideration of consolidated data and for its failure to consider such data in *LL&E*. But the decision cannot be considered as either arbitrary or irrational.

Furthermore, even if a rule was established by the *LL&E* decision, the agency's departure from it here appears not to have been a dispositive factor in its decision. The agency's office of Exceptions and Ap-

peals in its April 9, 1976 decision determined that Placid was not entitled to relief, though it had before it financial data relating only to refining operations. And while the agency in its final decision did consider consolidated data, its decision was largely an affirmance of the decision of the Office of Exceptions and Appeals.

Thus while the agency may have altered its approach somewhat in the decision under review here with regard to the range of financial data considered, the change in approach was not the type of arbitrary departure from an established rule that would mandate reversal of the agency's decision, particularly where, as here, there are other substantial grounds for distinguishing the prior agency decision.

Thus while the *LL&E* case was similar in many respects to the situation presented here, there are distinctions between the cases, relied upon by the FEA, which support the FEA's denial of relief here and which render that decision neither arbitrary nor irrational nor unsupported by substantial evidence. In view of that fact, and in view of the fact that Placid's other arguments have been rejected, Placid's motion for partial summary judgment is denied, and FEA's cross-motion for summary judgment on these issues is granted.[9]

### 3. *The Constitutional Claim.*

■ The FEA has moved for summary judgment on Placid's claim that the December 1 Rule works a taking of private property without just compensation in violation of the Fifth Amendment to the United States Constitution. If this court finds that a substantial constitutional claim exists, it is required by Section 5(a) of the EPAA[10] to certify that question to the Emergency Court of Appeals.

The FEA argues that no substantial constitutional issue is raised here because the validity of the December 1 Rule has already been upheld by the Emergency Court of Appeals against similar challenges. Placid would distinguish these prior decisions on the ground that they upheld the rule's validity as an *emergency* measure only, and Placid seeks to offer proof that the emergency at which the rule was directed—that is, a shortage of crude oil—no longer exists.

In the first case upholding the constitutionality of the rule, *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.1975), the Emergency Court of Appeals specifically withheld decision on whether the regulation would be valid "as a long continuing response to chronic energy problems." *Id.* at 362. Placid argues that that question is now ripe for decision in light of the alleged cessation of emergency conditions in the industry and in light of what Placid alleges to be a transformation of the regulatory program from temporary to permanent as a result of the passage in 1977 of the Department of Energy Organization Act, 42 U.S.C. § 7251.

The first problem with Placid's argument is that the challenged rule is not "permanent"; in fact it is scheduled to expire in 1981. Moreover, the policies announced by

---

**9.** The foregoing analysis has dealt primarily with the denial of exceptions to the December 1 Rule. Placid also challenges the FEA's denial of relief from the handling charge provision of the buy/sell program. That denial of relief, too, must be upheld as Placid has made no substantial claim that the imposition of the handling charge worked either severe hardship or gross inequity upon it. Moreover, at least as to prospective relief, the claim may be moot in view of the reduction of the handling charge from 30¢ to 5¢.

**10.** Section 5(a) of the EPAA, 15 U.S.C. § 754(a) (1976), incorporates Section 211 of the Economic Stabilization Act, which provides in part as follows:

(c) In any action commenced under this title in any district court of the United States in which the court determines that a substantial constitutional issue exists, the court shall certify such issue to the Temporary Emergency Court of Appeals . . . .

(g) The Temporary Emergency Court of Appeals, and the Supreme Court in review of judgments and orders of the Temporary Emergency Court of Appeals, shall have exclusive jurisdiction to determine the constitutional validity of any provision of this title or of any regulation or order issued under this title.

the EPAA are still in effect and, presumably, remain the policies of Congress. The wisdom or validity of those policies are, of course, beyond this court's legitimate concern. A more significant problem with Placid's argument is that the Emergency Court of Appeals has recently reaffirmed the constitutionality of the December 1 Rule without the limiting language of *Condor*.[11] *Basin, Inc. v. FEA,* 552 F.2d 931 (Em.App.1977). Thus, while the constitutional claim is by no means a frivolous one, and while, as the court held in *Griffin v. United States,* 537 F.2d 1130, 1137 (Em. App.1976) "should any state of facts fairly to be contemplated within the scope of the complaints indicate that there might have been an unconstitutional taking of plaintiffs' property, the question would have to be tried," nonetheless in light of the recent decisions, Placid has not raised here a substantial constitutional question with regard to the validity of the December 1 Rule. Consequently the issue will not be certified to the Emergency Court of Appeals. FEA's motion for summary judgment on this issue is granted. *See also Atlantic Richfield Co. v. FEA,* 429 F.Supp. 1052 (N.D.Cal.1978), *aff'd,* 556 F.2d 542 (Em.App.1977).

### 4. The Statutory Validity of the December 1 Rule.

Placid's final contention is that the December 1 Rule and the handling charge provisions of the buy/sell program are beyond the authority of the agency because they contravene the express objective of the EPAA to "foster competition in the . . refining . . . sectors . . . and to preserve the competitive viability of independent refineries [and] small refiners." 15 U.S.C. § 753 (1976). The agency has moved for summary judgment on this point.

■■ It has been repeatedly held that the nine objectives of the EPAA set forth at 15 U.S.C. § 753 are not mandatory rules but rather goals to be achieved "to the maximum extent practicable," and that the

FEA must be allowed broad flexibility in fashioning a regulatory scheme to achieve those goals. *See, e. g., Pasco, Inc. v. FEA,* 525 F.2d 1391 (Em.App.1975). On these grounds the December 1 Rule has been upheld against attacks virtually identical to that made here. *See Condor Operating Co. v. Sawhill, supra; Basin, Inc. v. FEA, supra.* Placid, however, claims that the agency should again be required to demonstrate the validity of the rule in the light of changed circumstances in the industry.

The validity of the December 1 Rule was last upheld in March, 1977. Placid's only argument at this stage is that "given the changing market conditions, it is certainly open to question whether the FEA's policies are consistent with the statutory mandates of the EPAA." Placid also offers several DOE statements to the effect that an emergency situation no longer exists with respect to crude oil supply.

It is a matter of judgment whether Placid should be able to try this claim. In view of the extremely narrow standard of review, Placid's chances of success on the claim are negligible. On that ground the FEA's motion for summary judgment on this issue is granted.

---

11. Placid also cites the following language from *Condor* as supportive of its right to introduce evidence on the constitutional claim:

A reasoned decision for the temporary suspension of usual ownership prerogative based upon broad national needs does not constitute necessarily an unconstitutional taking; and the issue of whether it does properly turns upon the circumstances of each case. 514 F.2d at 361.